[Civ. No. 15976.   First Dist., Div. One.   Nov. 1, 1954.]

LAWSON DAVIS, Appellant, v. EARL JOHNSON et al., Respondents.

Melvin B. Belli, Martin Field, John F. Moran and Ashe & Pinney for Appellant.

Dana, Bledsoe & Smith for Respondents.

BRAY, J.—Plaintiff appeals from a judgment after jury verdict, in favor of defendants.

### QUESTION PRESENTED

The refusal of the court to give offered instructions concerning certain rules of defendants' employer, the State Belt Railroad.

### EVIDENCE

The action was for injuries received by plaintiff when run over by a car or cars of the State Belt Railroad, an agency of the State of California. The sole defendants were two employees of that line, Johnson, the engineer, and Locke, foreman in charge. The accident occurred about 1:15 a. m. near Pier 56, Port of San Francisco. The train's crew consisted of defendants Locke and Johnson, Ramsey (brakeman, since deceased), Conlin (brakeman), and Williams (fireman). They were assigned the work of "spotting" six freight cars alongside the dock. The movement involved shoving the cars from the north side of Berry Street in a southerly direction in to Pier 56. To do this, the cars were first pulled along the Embarcadero down to Berry Street. Then the engine was uncoupled at the north edge of Berry Street and taken south across Berry Street to a switch point, in order to switch the engine around and get it north of the six freight cars, thus

making it possible to "shove" the cars into the pier. After effecting the switch and turning on the tunnel lights into the pier brakeman Ramsey stationed himself at the center of Berry Street, facing east to the Embarcadero. Foreman Locke stood at the north edge of Berry Street. There was a street light and a highway directional sign at the northwest corner of Berry Street and the Embarcadero, just west of the tracks. From the north of the cars the engine was banged into them for coupling purposes. Next, the crew "stretched" the cars. This consists of pushing them a few feet and then braking the engine. This causes each car to jerk with a loud noise and enables the trainmen to determine whether all the cars are coupled. This operation took place near the intersection of Berry Street and the Embarcadero. Defendant Locke testified that the operation was done in the "regular" way, to wit, Ramsey jumped on the lead freight car, taking his position on the right front ladder. Ramsey carried a lighted lantern. The other members of the crew were spotted on the right side of the train (except for the fireman, who was on the left side in the engine cab). Thus, signals from Ramsey on the lead car would be visible to Locke on the third car, to Conlin, and then to Johnson in the engine. It is railroad custom to stop a train immediately if one crewman's light disappears from the view of another. This is the reason for having the men all on the same side of the train. Locke testified that Ramsey, who was "riding the point" on the lead car, was not working under his direction as Ramsey was an experienced brakeman. (Due to his death, his version of the accident could not be obtained.) There was an impaired clearance on the left side of the train, in that a man could not safely ride into the tunnel on that side. There was evidence that it would be both unsafe and impractical for a man to ride on the front of the car rather than on the front side ladder. After the six cars had been shoved into Pier 56, and four cars spotted there, and about three to eight minutes after the train entered into the tunnel and the engine was on its way back and had pulled through the tunnel, plaintiff was observed lying between the outside (eastern) rail and a low wall. This would be on the left side of the train as it entered the tunnel, the opposite side from the train crew's position. His severed legs were found between the two easterly tracks. This area is unpaved and is used only by the railroad as an entrance to the tunnel. It is 200 to 300 feet south of the intersection of Berry Street and the Embarcadero and 31 feet south

of the paved area. It is plaintiff's contention that while at the intersection of Berry Street and the Embarcadero he saw no trainmen or lights, that, while there is no direct evidence to that effect, an inference could be drawn that as the train bore down on him he could have caught hold of some part of one of the cars, been carried to the point where he was found, lost his hold, and fallen under the train. He expressly negatives any claim that he was dragged from the intersection to the place where he was found, for the reason that the evidence would not support such theory. In order to recover he was required to prove that he was hit, or grabbed the train, while on the intersection, a point where the defendants would owe him the duty of exercising ordinary care to avoid injuring him. If the entire accident occurred where he was found, the defendants' duty was only to avoid wantonly injuring him and there was no evidence that would have warranted a finding that they violated such duty. Defendants contend plaintiff was struck where found. Actually the only evidence that he was struck at the intersection is plaintiff's statement hereafter mentioned. There was no physical evidence that he had been hit or dragged, or that he had been injured other than by having his legs run over. Blood was found on the left rear wheels of the lead car and on the left front wheels of the second car (left as the train entered the tunnel). No blood was found on the front wheel of the lead car. The blood beside the track indicated that the severing took place at the same spot where the body was found. The lighting there was very poor. The police officer found it necessary to use his car headlights and his flashlight to investigate the scene. Plaintiff testified that the accident happened ''on Berry and the Embarcadero'' and that before he got to the track he looked to his right and left and saw nothing coming. When he was in the middle of the track he ''looked right, saw the train going by five feet away, and I didn't know anything.'' He did not hear any whistle or bell or any noise and saw no light. He testified that he had spent the day at the hiring hall until 4 p. m., and then that he was not sure about it. He thought he stayed home, then that he did not remember up to about 1 o'clock when he went to the scene of the accident. When asked what the last thing he remembered before the accident was he did not know. In his deposition he did not remember being on the Embarcadero after dark, did not know what time of day he was injured, did not remember seeing a train moving just before he got hit, did remember being at

the hiring hall, leaving about 4 and then going to the unemployment insurance office, leaving there about 4:30 to get a bus to go home. He remembered nothing after that. At the trial he denied he had been drinking. In his deposition he admitted drinking "about two bottles of beer, that was all." Then he admitted having one drink of rum. After his deposition was written up he made several changes in it. Typical of these are the following: When asked if he remembered knowing anything after 4:15 p. m. he replied, "No, I don't know anything." He added to this "Except just before it hit me at Berry." He was asked if he was struck right at the corner of Berry and the Embarcadero. He replied, "No; right close to the track, not at the corner." He added to the deposition "But it was at the intersection where people cross." When asked if he recalled just a little bit before the accident happened he replied "No." He added to the deposition "Except looking before going on track, not seeing anything coming, walking to the middle of the track and seeing the car 5 feet away." The ambulance attendant testified that the odor of alcohol was very strong on plaintiff. The emergency ward entry record, admitted without objection, stated "Apparently patient had been drinking." Dr. Canty, who examined plaintiff at his request shortly before trial, testified that plaintiff told him the last thing plaintiff remembered he was at a union meeting the late afternoon and evening preceding the accident and the next thing he remembered he was in the hospital. Dr. Spalding who treated plaintiff at the Marine Hospital about six months after the accident testified that plaintiff told him he was injured "at some time and place unknown to him" and that "he didn't know what happened to him at the time."

### INSTRUCTIONS

Plaintiff's only complaint is of the failure of the court to give the instructions hereafter mentioned. The evidence shows that the trainmen (other than the fireman) were all on the right side of the train, none on the left side, the side where plaintiff was hit. Locke testified that when Ramsey turned on the switch lighting the tunnel Ramsey walked back to the intersection of Berry and the Embarcadero and stood in about the center of Berry. In the meantime the engine went north of Berry to attach to the northerly end of the cars. After attaching and stretching the cars Ramsey, from his position on Berry Street signalled Locke. Locke then

passed the signal to Conlin who passed it to the engineer. The signalling was done with lanterns. Then, as the engine started to back the cars southerly to and across Berry Street it was customary for Ramsey to swing aboard the lead car and "ride the point," that is, the right front ladder. Locke saw Ramsey take that position. This testimony put Ramsey on the crossing and then on the "point" at a time when plaintiff must have been at the crossing if he were struck there, and not at the place where he was found.

Certain rules of the State Belt were introduced into evidence. The refused instructions related to these rules. They were four in number, each relating to a different rule and were identical except as to the language of the particular rule. The first instruction read: "In determining whether or not the defendants in this case were guilty of negligence you may consider in determining that question whether or not they conformed with rule 12 of the State Belt Line, which reads as follows: When cars are pushed by an engine, a white light must be displayed on the front of the leading car by night." The second referred to rule 25 reading as follows: "When cars are pushed by an engine, a member of the crew must take a conspicuous position on the front of the leading car." The third referred to rule 25A reading as follows: "In all switching movements over public crossings not protected by gates or flagmen, a member of the crew must protect the crossing." The fourth referred to rule 65 reading as follows: "The protection of trains is the first importance, and engine foremen must not allow other duties to interfere therewith. They must require their helpers to act with the utmost promptness and in strict accordance with the rules. A trainman must be stationed, when practicable, on the rear of every train while in motion."

Plaintiff contends that these rules establish fixed standards of care, and hence the failure of the court to instruct concerning them is not only error but prejudicial error. Much of his opening brief is devoted to cases dealing with Vehicle Code provisions and other statutory enactments, municipal ordinances and safety rules of state commissions such as the Public Utility Commission and the Industrial Accident Commission. It is unnecessary to consider these cases as here we are not dealing with statutes, ordinances or rules of a state agency acting in its governmental capacity. We are dealing with a State agency acting in a proprietory capacity. (*People* v. *Superior Court*, 29 Cal.2d 754 [178 P.2d 1].) Its rules are,

in effect, similar to company rules of any other railroad. Plaintiff has not cited nor have we found any case holding that company rules establish a fixed standard of care making their violation negligence per se. As said in Wigmore on Evidence, 3d ed., § 282, cited by plaintiff, ". . . the *regulations* adopted by an *employer* for the conduct of a factory or a transportation system, *may be some evidence* of his belief as to the standard of care required, and thus of the negligent nature of an act violating those rules . . ." (Last emphasis added.) ▇ It is well settled that such rules are admissible in evidence and their violation is a circumstance to be considered in determining negligence. (See *Simon* v. *City & County of San Francisco,* 79 Cal.App.2d 590, 597 [180 P.2d 393]; *Pruitt* v. *San Pedro, L. A. etc. R. R. Co.,* 161 Cal. 29, 39 [118 P. 223, 36 L.R.A.N.S. 331]; *Gett* v. *Pacific G. & E. Co.,* 192 Cal. 621, 625 [221 P. 376].) The latest expression on the subject appears in *Powell* v. *Pacific Elec. Ry. Co.,* 35 Cal.2d 40, 46 [216 P.2d 448] : "The rule was properly admitted in evidence as bearing on the standard of care respondent thought appropriate to insure the safety of others at its track crossings. [Citations.] While a violation of such rule would not constitute negligence *per se,* it would be a circumstance for the jury to consider on the issue of respondent's negligence. [Citations.]" Plaintiff cites a number of decisions from other states, none of which hold the violation of a company rule to be negligence *per se,* but all of which hold it to be a circumstance to be considered by the trier of fact in determining negligence. Interestingly enough in none of the cases cited by plaintiff is there any discussion of whether instructions upon the subject are required. However, in *Powell* v. *Pacific Elec. Ry. Co., supra,* 35 Cal.2d 40, an instruction "as to the legal effect of . . . [a company] rule —— that while 'not the law,' a 'breach of duty' might be implied from a finding of violation of the rule" was upheld. (P. 47.) The opinion held further (p. 47) : "Since respondent's rule was 'not the law' but only a factor to be considered in the jury's evaluation of the *motorman's* conduct as a factual issue [citation], the standard of care that he was bound to exercise remained 'that of the man of ordinary prudence under the circumstances.' " This seems to be the only case in California which refers to an instruction on the subject. It does not discuss whether instructions are necessary. It merely holds that the one given was proper: Such rule is sound. ▇ In cases involving

possible violation of company rules the jury can properly be instructed that violation of a company rule is not negligence *per se* but a circumstance which they may consider in determining the question of negligence.

## PREJUDICIAL?

■ Under the evidence here, however, the failure to give the requested instructions was not prejudicial. First, the company rules do not in themselves establish a standard of care. The standard of care, whether there are company rules or not, is " 'that of the man of ordinary prudence under the circumstances.' " (*Powell* v. *Pacific Elec. Ry. Co., supra,* 35 Cal.2d 40, 47.) Hence the proposed instructions were on evidence and not on matters of law. ■ Plaintiff was not entitled, in any event, to a separate instruction upon each rule, any more than he would be entitled to a separate instruction on each piece of other evidence. The instant situation was somewhat similar to that in *Jorgensen* v. *East Bay Transit Co.,* 46 Cal.App.2d 189 [115 P.2d 556]. There in an action for damages for death alleged to have been caused by defendant's negligence, the death certificate was admitted in evidence. The plaintiffs offered three instructions dealing with the evidentiary effect of this certificate. The trial court refused them. In upholding its decision the reviewing court said (p. 194) : "All three of the proposed instructions were addressed to one specific piece of evidence—the said death certificate. The plaintiffs were not entitled to have the trial court 'stress a specific part of the evidence.' " At most plaintiff would have been entitled to an instruction to the effect that the jury in considering whether defendants were guilty of negligence could consider as a *circumstance* bearing on the question of negligence whether or not they violated *any* of the rules of the line admitted in evidence (rather than mentioning each specific rule separately). Plaintiff offered no such instruction.

Here, to be properly given, the court would have been required to consolidate plaintiff's four instructions and modified them to include the omitted matter. It was under no duty to do so. ■ "Courts are not obliged to reframe erroneous or incomplete instructions and parties cannot complain that an instruction of that character has not been given." (*Bertolozzi* v. *Progressive Concrete Co.,* 95 Cal.App.2d 332, 337 [212 P.2d 910] ; see also *Roy* v. *Mission Taxi Co.,* 101 Cal.App.2d 438, 447 [225 P.2d 920] ; *Huggans* v. *Southern Pac. Co.,* 92

Cal.App.2d 599, 614 [207 P.2d 864].) ▮▮ Secondly, the rules were admitted in evidence and were before the jury and undoubtedly plaintiff argued the effect of their violation. The court did instruct that "negligence is the doing of some act which a reasonably prudent person would not do, or the failure to do something which a reasonably prudent person would do, actuated by those considerations which ordinarily regulate the conduct of human affairs. It is the failure to use ordinary care in the management of one's property or person" and "You are instructed that if the defendants knew or should have known of plaintiff's presence on the track, then the defendants were under the duty to exercise toward plaintiff that degree of care that a reasonably prudent person would have exercised under the circumstances."

In *Estate of Dolbeer*, 149 Cal. 227 [86 P. 695, 9 Ann.Cas. 795], the reviewing court had before it the failure of the trial court to instruct that the jury might take into consideration in considering whether the testatrix was of sound mind at the time of making her will, the fact that she committed suicide. The court's language is particularly appropriate here (p. 252): "Nevertheless, it cannot be said that the refusal of the court to give this instruction and others which may be considered to stand in like position affords substantial ground for reversal of the case. In the first place, it certainly may be presumed that when the court admitted evidence tending to show that Miss Dolbeer committed suicide the jury understood that it was to be considered by them as evidence bearing upon the question of her mental capacity at the time of the making of the will." (See also *Stuart* v. *Preston*, 2 Cal.App.2d 310 [38 P.2d 155, 39 P.2d 441].) In *Still* v. *San Francisco etc. Ry. Co.*, 154 Cal. 559, 572 [98 P. 672, 129 Am.St.Rep. 177, 20 L.R.A.N.S. 322], concerning the failure to give an instruction that "in determining the question of incompetency, the jury might take into consideration 'with other evidence' given on the trial, certain specified evidence" the court said: "Under their general instructions, the jury must have known that this evidence with all other evidence on the subject was to be considered by them in determining the question." The same is true of the company rules in our case. That the jury must have known that they were to consider the rules is shown by the fact that the court referred to the rule requiring a white light on the front of the leading car and then instructed that what is

"front" is not defined by the rules and must be interpreted in the light of railroad custom and practice. The crew members testified that the custom of railroading is that by "front" the rules meant the right front ladder where the evidence indicates Ramsey was standing. A man on the front of the car would be easily shaken off and such a fall would place him directly in the path of the train. Furthermore such a position would be impractical, as it is a rule of the road to stop the train the moment any crew member passes from sight of another. The interpretation of the rules by these crewmen, representing many years of railroading, must be taken as correct in the absence of evidence of any contrary interpretation. (See *Drummond* v. *Alfred E. Norton Co.*, 156 App.Div. 126 [141 N.Y.S. 29], affd. 213 N.Y.S. 670 [107 N.E. 1076].) With the rules in evidence before them and one instruction by the court concerning them, it is more reasonable to assume that the jury would believe a violation of them more serious than the proposed instruction would make them It is inconceivable under the evidence in this case that had the refused instruction been given, any different verdict would have resulted.

The judgment is affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied December 29, 1954. Carter, J., was of the opinion that the petition should be granted.