184 Cal.App.3d 593 (1986)
229 Cal. Rptr. 225
ESTATE OF HAZEL MANN, Deceased.
NORMAN VAN GORP, Contestant and Respondent,
v.
ROY LAIRD SMITH, as Executor With the Will Annexed, etc., Claimant and Appellant.
Docket No. A021934.
Court of Appeals of California, First District, Division Two.
August 19, 1986.
*598 COUNSEL
Carl B. Shapiro, B.E. Bergesen III and Siegfried Hesse for Claimant and Appellant.
*599 John H. Pollak for Contestant and Respondent.
OPINION
KLINE, P.J.
Appellant Roy Laird Smith appeals from a judgment revoking probate of the will of Hazel Mann after a jury found that decedent was of unsound mind at the time she executed the will and that execution of the will was obtained through appellant's undue influence. Appellant contends the verdict is unsupported by the evidence and that the trial court committed prejudicial error in failing to give a requested jury instruction pertaining to undue influence. We agree with all appellant's claims and, accordingly, shall reverse the judgment.

FACTS
Hazel Mann, a resident of Mill Valley, California, died on March 22, 1981, at the age of 94 years. At the time of her death, her closest relatives were two nephews, appellant Smith and respondent Van Gorp, who lived in Mill Valley and Missouri, respectively.
Appellant and decedent had a close relationship throughout his life. During his childhood and adolescence appellant lived either with his mother in San Francisco or in foster homes in the San Francisco Bay Area and saw decedent frequently. Beginning with a tour of duty in the Coast Guard in 1960, appellant spent a number of years in Hawaii, corresponding with his aunt by letter and phone. After returning to Mill Valley in 1967, appellant served in the Merchant Marine for several years, staying either with his aunt or with friends when he was not at sea. Thereafter, appellant resided in Marin County and saw decedent on a daily or weekly basis. Appellant testified that his aunt was as close as or closer than his mother; a letter from appellant's mother to decedent referred to appellant as "our son." Respondent stipulated that decedent helped raise appellant and that they were very close.
Decedent also had a close and warm relationship with respondent, although she saw him less regularly. Decedent and respondent's mother, Pearl, corresponded almost weekly. In 1926, when respondent was five years old, he spent six months with his mother living in an apartment building in San Francisco owned by decedent and her husband. Other visits occurred in 1940, 1968, 1969, 1972, 1974, and 1978, and respondent telephoned decedent periodically during the 1970s.
*600 In November 1975, appellant became conservator of decedent's person and estate. Appellant testified that he sought the conservatorship on the advice of a social worker and decedent's physician, Dr. Lee; Dr. Lee corroborated this testimony. Respondent also testified that he believed the conservatorship was a good idea. The factors which led to the conservatorship involved decedent's inability to care for herself both financially and personally. George Bennetts, son of decedent's neighbor, testified that he helped decedent pay her bills for two to three years in the early 1970s, having noticed unpaid bills when he visited her house. Others testified that prior to the conservatorship decedent was not eating or caring for herself properly; that she was unclean and smelled of urine; that her home was unkempt and her bed filthy; that she did not seem to know how to order the right food from a store; and that she described a toy doll as "me" and seemed "kind of dreamy."
As for financial matters, appellant testified that decedent had loaned $5,000 to friends without taking a note and that valuable pieces of jewelry would periodically disappear. Appellant was concerned that she might fall prey to people trying to take her money. Around the same time, decedent gave $10,000 to appellant, a fact apparently not disclosed in his deposition or in the conservatorship proceedings. Dr. Lee felt decedent was easily confused, forgetful and too casual or frivolous with money. On one occasion she offered him $20 because she thought it was nice of him to come over, and he thought she would have done the same for a delivery boy. Decedent's accountant also expressed concern with her leaving large amounts of cash around the house.
Dr. Lee's notes indicated that in 1979 decedent suffered from senility secondary to arteriosclerosis. He described senile dementia as a gradual progressive disorder with three stages, loss of recent memory, confusion, and dementia or unreality, and placed decedent in the second stage in 1975-1976. According to Dr. Lee, the process occurring during these years was the cause of what he described as decedent's confusion and variable mental state at that time, such as occasionally forgetting dates, the time of year, and what she was doing or eating.
In a declaration filed in the conservatorship proceeding, Lee stated his medical opinion that because of decedent's "present state of mental weakness" she was "unable to rationally and intelligently handle her own affairs." He testified that at this time decedent would sometimes appear extremely senile, sometimes better and more oriented. In deposition testimony read at trial, Lee referred to decedent as misrepresenting reality, for example, by saying she had no problem going to the bathroom while she was "covered with her own feces."
*601 Respondent testified that decedent did not recognize him on the phone in mid-1975, and had forgotten that his mother, her sister Pearl, had died two years previously.
On the other hand, several other witnesses testified that decedent was mentally competent and able to carry on a coherent conversation during the 1975-1977 time period. John Finn, an accountant with the Internal Revenue Service who helped prepare her annual tax returns, first met decedent in 1960. Finn testified that in 1974 and 1975 decedent had a "pretty good grasp of her financial situation," although he was upset that she left a lot of cash laying around. He also stated that he found decedent's mental condition "considerably improved" after appellant became her conservator.
A good deal of emphasis at trial was placed on appellant's purchase with conservatorship funds of a $4,000 hot tub which was used primarily by appellant and his friends. Appellant was the only witness who claimed to have seen decedent use the tub at all. Vonnie Adcock, who became decedent's live-in housekeeper a few months prior to the signing of the will, testified that decedent did not like to use the hot tub. Decedent spent her time sitting at the dining room table looking at the yard, rearranging pictures or watching TV. She had been a poet earlier in life, but no longer read. She did not initiate other activities, and did not like to leave the house. She wanted constant company. She was pleased to have visitors, and tended to be a little flirtatious. Dr. Lee described her as having a characteristic mannerism of pretending not to know people as a means of expressing displeasure with them.
Decedent's will was executed on July 17, 1976. The will was drawn by Attorney Robert Williams, a friend of appellant's. Appellant first sought Williams's help after the establishment of the conservatorship because of the "intermingling" of a young man named Archer, whose attentions confused decedent. According to appellant, Archer was a nuisance who unjustifiably complained to the authorities that decedent was not being properly cared for. Evidence was also adduced that Archer had taken decedent to an attorney for an undisclosed purpose, which might have been the making of a will. With Williams's assistance, appellant obtained a temporary restraining order keeping Archer away from decedent.
Williams's first discussions of a will with decedent occurred a month or two after resolution of the problem with Archer. Appellant brought decedent to Williams's office on what appeared to Williams to be a usual social visit following decedent's appointment at the beauty salon next door. Appellant told Williams decedent had mentioned her need for a will, and Williams agreed to help. The contents of the will were first discussed in a meeting *602 at decedent's home sometime within the next month. Appellant was on the premises but not present for this discussion, during which decedent indicated her desire to give the bulk of her property to appellant.
The subscribing witnesses to the will were Williams, Dr. Lee, and Vonnie Adcock. All testified decedent was alert and knew she was signing a will. Only Dr. Lee specifically remembered decedent discussing the terms of the will. Williams testified that he probably asked decedent to acknowledge that she knew the nature of her estate. Adcock did not remember the will being discussed, but only general conversation and decedent "being pleased that there were men people coming to visit her." Evidence was conflicting as to whether appellant was present at the execution of the will, or was elsewhere on the premises. Williams and appellant stated that appellant was not in the room, but appellant was impeached with his deposition testimony that he was present and Lee and Adcock testified that he was present.

DISCUSSION

I.

Testamentary Capacity
(1) "[T]he determinants of testamentary capacity are whether the individual `has sufficient mental capacity to be able to understand the nature of the act he is doing, and to understand and recollect the nature and situation of his property and to remember, and understand his relations to, the persons who have claims upon his bounty and whose interests are affected by the provisions of the instrument.'" (Estate of Fritschi (1963) 60 Cal.2d 367, 372 [33 Cal. Rptr. 264, 384 P.2d 656], quoting Estate of Smith (1926) 200 Cal. 152, 158 [252 P. 325]; see Prob. Code, § 6100.5.) (2) Testamentary capacity must be determined at the time of execution of the will. (Fritschi, supra, at p. 372.) Incompetency on a given day may, however, be established by proof of incompetency at prior and subsequent times. (Estate of Fosselman (1957) 48 Cal.2d 179, 185 [308 P.2d 336].) Where testamentary incompetence is caused by senile dementia at one point in time, there is a strong inference, if not a legal presumption, that the incompetence continues at other times, because the mental disorder is a continuous one which becomes progressively worse. (Estate of Fosselman, supra, 48 Cal.2d 179, 186.)
(3) The burden is on the contestant to overcome the presumption that a testator is sane and competent. (Fritschi, supra, 60 Cal.2d at p. 372.) (4) On appeal, however, "`[t]he rules of evidence, the weight to be accorded to the evidence, and the province of a reviewing court, are the *603 same in a will contest as in any other civil case.... The rule as to our province is: "In reviewing the evidence ... all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. It is an elementary ... principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court." (Italics added.) ...'" (Estate of Teel (1944) 25 Cal.2d 520, 526 [154 P.2d 384].) "[A]ll of the evidence must be examined, but it is not weighed. All of the evidence most favorable to the respondent must be accepted as true, and that unfavorable discarded as not having sufficient verity to be accepted by the trier of fact. If the evidence so viewed is sufficient as a matter of law, the judgment must be affirmed." (5) (See fn. 1.) (Id., at p. 527; Estate of Russell (1947) 80 Cal. App.2d 711, 713 [182 P.2d 318].)[1]
(6a) Keeping these principles in mind, we conclude that the record in this case is devoid of affirmative evidence of testamentary incapacity at the time decedent executed her will.
(7a) It is well established that "old age or forgetfulness, eccentricities or mental feebleness or confusion at various times of a party making a will are not enough in themselves to warrant a holding that the testator lacked testamentary capacity." (Estate of Wynne (1966) 239 Cal. App.2d 369, 374 [48 Cal. Rptr. 656], citing Estate of Sanderson (1959) 171 Cal. App.2d 651, 660 [341 P.2d 358] and Estate of Lingenfelter (1952) 38 Cal.2d 571, 581 [241 P.2d 990].) "It has been held over and over in this state that old age, feebleness, forgetfulness, filthy personal habits, personal eccentricities, failure to recognize old friends or relatives, physical disability, absentmindedness and mental confusion do not furnish grounds for holding that a testator lacked testamentary capacity." (Estate of Selb (1948) 84 Cal. App.2d 46, 49 [190 P.2d 277].) (8a) Nor does the mere fact that *604 the testator is under a guardianship support a finding of lack of testamentary capacity without evidence that the incompetence continues at the time of the will's execution. (Estate of Nelson (1964) 227 Cal. App.2d 42 [38 Cal. Rptr. 459]; Estate of Wochos (1972) 23 Cal. App.3d 47 [99 Cal. Rptr. 782].)
(9) It must be remembered, in this connection, that "[w]hen one has a mental disorder in which there are lucid periods, it is presumed that his will has been made during a time of lucidity." (Estate of Goetz (1967) 253 Cal. App.2d 107, 114 [61 Cal. Rptr. 181].) (6b) Dr. Lee testified that decedent's mental state fluctuated and that the conservatorship was established to protect her from the "worst times." Vonnie Adcock testified that even in late 1977 decedent had periods of alertness, as John Finn, decedent's tax accountant, also testified. Thus a finding of lack of testamentary capacity can be supported only if the presumption of execution during a lucid period is overcome.
The witnesses to execution of the will all testified decedent was aware of what she was doing at the time, and that they would not have signed the will if this had not been true.[2] (10) While the jury was free to disbelieve this testimony, "[d]isbelief does not create affirmative evidence to the contrary of that which is discarded." (Estate of Bould (1955) 135 Cal. App.2d 260, 264 [287 P.2d 8].) (6c) The only evidence suggestive of decedent's incapacity at the time the will was executed is in fact evidence of her condition at other times. That is, the only bases for the conclusion she lacked capacity at the time of execution would be inferences that the factors leading to the conservatorship rendered her incapable of comprehending the extent of her property and continued to so affect her at the time of the will's execution, and that her senility caused faulty recollection at this time.
There are several problems in the indulging of such inferences. (8b) First, the fact that a testator has been placed under a guardianship does not *605 in itself establish testamentary incapacity. (Estate of Nelson, supra, 227 Cal. App.2d 42, 55-56; see also, Note, Effect of Adjudication of Mental Incompetency on Power to Make a Will (1943) 16 So.Cal.L.Rev. 355.) Since a conservatorship, unlike a guardianship, does not involve a declaration of incompetence (Estate of Wochos, supra, 23 Cal. App.3d 47, 54), a conservatorship raises an even weaker inference of testamentary incapacity.[3]
Second, the inference of incapacity which arises from an adjudication of incompetence in a guardianship proceeding is only of incapacity as of the time of the finding (Estate of Nelson, supra, 227 Cal. App.2d at p. 55), and evidence must be produced to show that the condition continues at the time of a subsequent will execution. (Ibid.) If the inference arising from a guardianship cannot be presumed to continue, no such presumption can arise from a conservatorship. (6d) Moreover, not only was there no evidence that decedent's mental or physical condition declined between the time of the conservatorship proceedings and execution of the will, but there was evidence that both improved during this period.[4]
Third, it is not clear that the symptoms which led to the conservatorship necessarily demonstrate incompetence. The express basis of the conservatorship was decedent's inability to manage her person and property. (7b) Inability to transact ordinary business does not establish testamentary incapacity (Estate of Sanderson, supra, 171 Cal. App.2d 651, 657); nor do "filthy personal habits" or physical disabilities. (Estate of Selb, supra, 84 Cal. App.2d 46.)
(6e) Finally, while advanced senility which interferes with the ability to understand the nature of the testamentary act, the extent of one's property and one's relations to those interested in it is sufficient evidence of testamentary incapacity (Estate of Fosselman, supra, 48 Cal.2d 179; Estate of Callahan (1967) 67 Cal.2d 609, 615 [63 Cal. Rptr. 277, 432 P.2d 965]), the evidence in this case is of a much lesser degree of senility at the time of execution. Indeed, the only evidence was of a degree of senility which did not preclude mental alertness, and Dr. Lee, the only witness who testified decedent was medically senile, also stated she was alert when the will was executed and understood the nature and implications of her act. Dr. Lee had known decedent longer than two years at the time the will was executed. *606 His testimony was uncontroverted, and is especially significant as he appears to be one of the few witnesses not aligned with either side to the controversy.
In sum, the evidence of incompetence in this case is much weaker than that held insufficient to justify the setting aside of wills in numerous other cases (see, e.g., Estate of Lingenfelter, supra, 38 Cal.2d 571, and cases cited in Estate of Russell, supra, 80 Cal. App.2d 711, 721) and is simply not enough to overcome the presumption that the testator was sane and competent at the time of the will's execution. (Estate of Fritschi, supra, 60 Cal.2d 367, 372.)

II.

Undue Influence
(11) In order to set aside a will on grounds of undue influence, "[e]vidence must be produced that pressure was brought to bear directly on the testamentary act.... Mere general influence ... is not enough; it must be influence used directly to procure the will and must amount to coercion destroying free agency on the part of the testator." (Estate of Welch (1954) 43 Cal.2d 173, 175 [272 P.2d 512], italics in original.) There must be proof of "`a pressure which overpowered the mind and bore down the volition of the testator at the very time the will was made.'" (Id., at p. 176; Estate of Lingenfelter, supra, 38 Cal.2d 571, 586-587.)
(12) When a confidential relationship exists between the decedent and the beneficiary, and the beneficiary both actively participates in procuring the execution of the will and unduly profits by it, a presumption of undue influence arises and places on the beneficiary the burden to show that the will was freely made. (Estate of Graves (1927) 202 Cal. 258, 262 [259 P. 935]; Estate of Lingenfelter, supra, 38 Cal.2d 571, 585; 7 Witkin, Summary of Cal. Law (8th ed. 1974) Wills and Probate, § 111, p. 5625.)
(13a) In the present case, appellant conceded his confidential relationship to decedent; the question is whether the evidence supports findings that he unduly benefitted under the will or actively participated in procuring its execution.
As to the element of undue benefit, the evidence does not support a finding that the will was unnatural. A nephew is not necessarily the natural object of an aunt's bounty (Estate of Darilek (1957) 151 Cal. App.2d 322, 331 [311 P.2d 615]; Estate of Jacobs (1938) 24 Cal. App.2d 649, 651 [76 P.2d 128]); thus, the fact that decedent left comparatively little to respondent *607 does not in itself support an inference of undue influence. Moreover, although appellant and respondent were of equal degrees of blood relation to decedent, decedent's actual relationship with appellant was clearly the more significant. Decedent helped raise appellant; he lived close to her most of his life; he took care of her and she accepted and relied upon him as her conservator. Whether between relatives, or between friends and relatives, numerous cases have held that a will is not unnatural where it provides for one who has had a particularly close relationship with, or cared for the testator, or is in comparatively greater need of financial assistance. (Estate of Jacobs, supra, 24 Cal. App.2d 649, 652 [will to friends rather than nephew]; Estate of Wright (1963) 219 Cal. App.2d 164 [33 Cal. Rptr. 5] [friend rather than nephew]; Estate of Locknane (1962) 208 Cal. App.2d 505, 515 [25 Cal. Rptr. 292] [most left to the one of several children who had cared for testator and had no other source of income].) (14) "`"Influence gained by kindness and affection will not be regarded as `undue' if no imposition or fraud be practiced...."'" (Estate of Bould, supra, 135 Cal. App.2d 260, 272.)
(13b) The only basis for concluding that an unnatural disposition was made was respondent's testimony that prior to making the will decedent expressed a desire to divide her property equally between the nephews. (Estate of Gelonese (1974) 36 Cal. App.3d 854, 866 [111 Cal. Rptr. 833]; Estate of Garibaldi (1961) 57 Cal.2d 108, 110 [17 Cal. Rptr. 623, 367 P.2d 39].) Assuming this testimony to be true, however, in light of the respective relationships with decedent, it cannot be said that appellant unduly profited by the will.
Moreover, even if the disposition were unnatural, and despite the confidential relationship between appellant and decedent, the verdict can be supported only upon evidence appellant actively procured execution of the will (Estate of Fritschi, supra, 60 Cal.2d 367, 374.); such evidence is lacking.
(15) While undue influence may be proved by circumstantial evidence (Estate of Garibaldi, supra, 57 Cal.2d 108, 113; Estate of Ausseresses (1960) 178 Cal. App.2d 487, 488-489 [3 Cal. Rptr. 124]), proof of circumstances consistent with undue influence is insufficient  the proof must be of circumstances inconsistent with voluntary action. (Estate of Lombardi (1954) 128 Cal. App.2d 606, 612 [276 P.2d 67]; Estate of Bould, supra, 135 Cal. App.2d 260, 270; Estate of Wright, supra, 219 Cal. App.2d 164, 171.) "[M]ere opportunity to influence the mind of the testator, even coupled with an interest or a motive to do so, is not sufficient." (Estate of Welch, supra, 43 Cal.2d 173, 175; Estate of Fritschi, supra, 60 Cal.2d 367, 373-374.) There must be activity by the beneficiary in the actual preparation of the will. (Estate of Straisinger (1967) 247 Cal. App.2d 574, 586 [55 Cal. Rptr. 750].)
*608 (13c) While appellant obviously had the opportunity and motive to influence decedent, the most that can be drawn from the evidence concerning his activity in procuring the will is that he urged her to make a will "if she was so inclined," took her to an attorney for this purpose, and was present at the execution of the will.
Evidence that appellant urged decedent to make a will is irrelevant inasmuch as there is no evidence he urged her to make any particular disposition. We note, too, the undisputed evidence that respondent also urged decedent to make a will.
(16) "[T]he mere fact of the beneficiary procuring an attorney to prepare the will is not sufficient `activity' to bring the presumption into play ...; or selection of attorney and accompanying testator to his office ...; or mere presence in the attorney's outer office; ... or presence at the execution of the will ...; or presence during the giving of instructions for the will and at its execution ..." (Estate of Bould, supra, 135 Cal. App.2d 260, 275-276, citations omitted.) (13d) The evidence is uncontradicted that appellant was not present during Williams' main discussion with decedent regarding the substance of the will, and there is no evidence his presence at execution of the will was anything but that of a passive observer. (Estate of Jacobs, supra, 24 Cal. App.2d 649, 652.) While the fact that a beneficiary took the testator to his own attorney has been viewed as a circumstance indicating undue influence where the selection of attorney was accomplished by deception (Estate of Beckley (1965) 233 Cal. App.2d 341, 347-348 [43 Cal. Rptr. 649]), no such improper conduct appears here. Appellant simply took decedent to the attorney he knew. In light of the suspicions aroused by the Archer affair, it was entirely appropriate for appellant, as decedent's conservator, to encourage her to make a will and thereby insure against fraudulent claims by Archer or another.
Finally, there is no evidence that appellant sought to determine the contents of the will. The sole basis for inferring such an effort would be the suggestion in Williams' testimony that he and appellant discussed the revocation clause of the will.[5] Assuming the jury drew this inference, it supports only the conclusion that the revocation clause was discussed  a fact which would not be surprising since, as conservator, appellant would be rightly concerned that Archer might have induced a prior will. There is absolutely no evidence appellant in any way affected the dispositive contents of the will, and "`[a] *609 will cannot be overturned on the mere speculation or suspicion that undue influence may have been used to procure it.'" (Estate of Niquette (1968) 264 Cal. App.2d 976, 980 [71 Cal. Rptr. 83]; Estate of Welch, supra, 43 Cal.2d 173, 180.)

III.

Refusal of Requested Jury Instructions
Having determined that there is insufficient evidence either that decedent lacked testamentary capacity at the time she executed her will or that appellant procured the will through undue influence we can reverse the judgment without determining whether the trial court's refusal to give certain jury instructions requested by appellant was error and, if so, whether the error was prejudicial. We think it useful to address the instructional issue, however, because we think it has an important bearing upon the evidentiary problems just discussed.
Where, as here, a jury sets aside a will without that substantial evidence which the law requires, it usually does so in order to replace the expressed opinion of the testator with its own point of view about what constitutes a reasonable and just disposition of the testator's property. (17) Few principles are more firmly established in the law of probate, however, than the principle that "a will is not to be upset because its provisions may seem to the court or the jury to be unreasonable, unnatural, foolish, or unjust." (Estate of Higgins (1909) 156 Cal. 257, 265 [104 P. 6]; accord, Estate of Perkins (1925) 195 Cal. 699, 709 [235 P. 45]; Estate of Martin (1915) 170 Cal. 657 [155 P. 138]; 663; Estate of Packer (1913) 164 Cal. 525, 528 [129 P. 778]; In re Wilson (1897) 117 Cal. 262, 277 [49 P. 172]; In re Langford (1895) 108 Cal. 608, 624 [41 P. 701]; In re Spencer (1892) 96 Cal. 448, 452 [31 P. 453]; In re McDevitt (1892) 95 Cal. 17, 33 [30 P. 101]; Estate of Greenhill (1950) 99 Cal. App.2d 155, 158 [221 P.2d 310]; Estate of Alegria (1948) 87 Cal. App.2d 645, 655-658 [197 P.2d 571]; Estate of Markham (1941) 46 Cal. App.2d 307, 314 [115 P.2d 866]; Estate of Burns (1938) 26 Cal. App.2d 741, 748 [80 P.2d 77]; Estate of Nolan (1938) 25 Cal. App.2d 738, 740 [78 P.2d 456].) In the words of the standard jury instruction currently in use in California, "Every person of sound mind, over the age of 18 years, and not acting under [menace] [duress] [undue influence] [fraud], has the right to make a will directing the disposition of his property upon his death in any way he sees fit. He is under no obligation to make such disposition as will meet with the approval of a judge or jury. [¶] The right to dispose of property by will is a fundamental right assured by law and does not depend upon this right being wisely used. [¶] A will *610 cannot be set aside simply because it may appear to [the jury] to be unreasonable or unjust." (BAJI No. 12.02.)
It is no secret that instructions such as this are repeatedly ignored. In 1892 our Supreme Court unhappily observed that "juries lean against wills which to them seem unequal or unjust." (In re McDevitt, supra, 95 Cal. 17, 33.) In several later cases decided before the turn of the century the Supreme Court again noted, with apparently increasing distress, that "[t]he upsetting of wills is a growing evil" (Estate of Carriger (1894) 104 Cal. 81, 84 [37 P. 785], quoted with approval in Estate of Morey (1905) 147 Cal. 495, 505 [82 P. 57], and again in Estate of Carson (1925) 74 Cal. App. 48, 63-64 [239 P. 364]), and that "quite a number of people have come to think that the right to dispose of property by will has but little significance, and may be legally disregarded whenever the testator has not disposed of his property in a manner which suits the views of a jury." (In re Wilson, supra, 117 Cal. 262, 270.) The Supreme Court more recently adverted to this problem in Estate of Fritschi, supra, 60 Cal.2d 367, where it pointed out that a "legion" of appellate decisions have been necessary in order to "strike down attempts of juries to invalidate wills upon the ground of undue influence in order to indulge their own concepts of how testators should have disposed of their properties."[6] (Id., at p. 373, fn. omitted.)
The responsibility to give force to the legal principle of free testamentary disposition does not rest solely with appellate courts, but must also be accepted by trial judges.[7] One of the ways in which trial judges are best *611 positioned to discharge this responsibility is in the giving of instructions. (18) The court's charge to the jury, considered in its entirety, must be clear and complete; it must properly state the rules regarding the burden of proof and presumptions, must impose upon the party that bears the burden the proper degree of proof and must fairly describe all the factors which must be found in order to give rise to any legal presumption. Where it would assist the trier of fact in better comprehending and applying the relevant legal principles, counsel and judges should freely modify and supplement the standard jury instructions to fit the particular case. (BAJI (7th ed.) p. 6; 7 Witkin, Cal. Procedure, Trial, § 252, p. 257.) The instructions should avoid "singling out and bringing into prominence before the jury certain isolated facts and thereby, in effect, intimating to the jury that special consideration should be given to those facts." (Estate of Martin, supra, 170 Cal. 657, 672.) In the instant case such necessary care was not taken.
(19a) We find that the court's failure to give appellant's requested jury instruction number 2 or similar instruction was error because without it the jury was not fully and fairly informed of the circumstances essential to set up the presumption of undue influence.[8]
The court gave general instructions on undue influence,[9] and instructed on the presumption of undue influence as follows: "A confidential relationship *612 existed between the decedent and Roy Laird Smith. [¶] If you find that Roy Laird Smith was active in procuring the will, and unduly profited from it, you will find that the will was procured by undue influence of Roy Laird Smith unless he overcomes the presumption of undue influence by a preponderance of the evidence." None of the instructions given elaborated upon the phrases "active in procuring the will" and "unduly profited" used in this instruction. Appellant's requested instruction, however, delineated the preliminary facts necessary to trigger the presumption. In essence, the proposed instruction stated that appellant must be found to have "carried on some activity which led to the terms of the will in question" and "conducted some activity concerning the execution of the will;" that merely taking the testatrix to the attorney or paying for the drafting of the will is in and of itself insufficient to raise the presumption; that "undue profit means obtaining substantial benefits not the normal expression of the testatrix's bounty; and that prior expressions of dispositive intent and relative relationships of the parties with the testatrix could be considered on the question of undue profit."[10]
(20a) A party has the right to have the jury instructed on the law applicable to all theories of the case supported by the evidence. (Fish v. Los Angeles Dodgers Baseball Club (1976) 56 Cal. App.3d 620, 633 [128 Cal. Rptr. 807, 91 A.L.R. 3d 1].) "`It is incumbent upon the trial court to instruct on all vital issues involved,'" (id., at p. 634) and the court "`should not require a party to rely on abstract generalities ... but should instruct the jury in terms that relate to the particular case before it.'" (Id., at p. 642.) (19b) These principles are particularly significant in will contests because unless the jury is emphatically reminded of the specific nature of the ultimate *613 issues of fact and the limits upon the inferences it may properly draw there is real danger the rules of testamentary capacity and undue influence will be disregarded.
The instruction proposed by appellant is a correct statement of the law.[11] Although tailored to the facts of the case, it is not slanted or argumentative. (Wank v. Richman & Garrett (1985) 165 Cal. App.3d 1103, 1112 [211 Cal. Rptr. 919].) It does not stress details of particular pieces of evidence (Davis v. Johnson (1954) 128 Cal. App.2d 466, 473-474 [275 P.2d 563]; Lenard v. Edmonds (1957) 151 Cal. App.2d 764, 774-775 [312 P.2d 308]) but rather directs the jury's attention to general factors which bear on its determination. While theoretically incomplete in the sense that the list of factors which might conceivably bear upon undue influence is endless, the factors pinpointed are the ones that appear from the evidence received at trial. Therefore, in the context of this case, the instruction is not misleading.
Moreover, the jury was in need of guidance. The definitions of the terms in the general instruction on the presumption of undue influence are not self-evident, and the facts of this case are such that the jury could easily have based its verdict on improper factors. Thus, appellant's taking decedent to Williams' office is the most obvious activity in procuring the will, and the jury was not told that more was required. Indeed, in his closing argument respondent's attorney suggested that "hovering around" decedent during the execution or discussion of her will, or such other factors the jury deemed *614 to show activity in procuring the will, would be sufficient.[12] Additionally, respondent's closing argument may well have misled the jury as to the undue profit element by incorrectly stating that undue benefit is shown "when he gets most of it and somebody of the same descent gets something else."
We do not say that the proposed instruction is perfectly refined. (20b) But the imperfection of a proposed instruction does not relieve a trial court of its obligation to adequately instruct the jury upon those issues for which instructions were given, so as to give the jury a full understanding of the case. (Pedesky v. Bleiberg (1967) 251 Cal. App.2d 119, 124 [59 Cal. Rptr. 294]; Roberts v. City of Los Angeles (1980) 109 Cal. App.3d 625, 632 [167 Cal. Rptr. 320].)[13] The need to provide adequate instructions is particularly acute where the jury requests specific guidance. (Trejo v. Maciel (1966) 239 Cal. App.2d 487, 498 [48 Cal. Rptr. 765].) (19c) Here the jury requested reinstruction on "that portion of `undue influence' that states `active and procuring will' et cetera"; the court's rereading of the rather general instructions previously given was an insufficient response.
(21) Failure to give a requested instruction which results in removing a valid theory of the case from the jury's consideration is inherently prejudicial (Ng v. Hudson (1977) 75 Cal. App.3d 250, 261 [142 Cal. Rptr. 69] [refusal to instruct on contributory negligence]; Phillips v. G.L. Truman Excavation Co. (1961) 55 Cal.2d 801, 808 [13 Cal. Rptr. 401, 362 P.2d 33] [contributory negligence].) (19d) Although the theory that undue influence could not be found because appellant had not been active in preparation of the will was presented to the jury in argument, its legal parameters were not defined by the court. Given the facts of this case, the denial of an instruction which explicated crucial terms relating to a presumption which served to switch the burden of proof to appellant can only be seen as prejudicial.
*615 For the foregoing reasons, the judgment is reversed. Each party to bear its own costs on appeal.
Rouse, J., and Smith, J., concurred.
A petition for a rehearing was denied September 8, 1986, and respondent's petition for review by the Supreme Court was denied November 12, 1986.
NOTES
[1] We disagree with appellant's suggestion that our review should be affected by the fact that the jury initially found that decedent was of sound mind. The jury returned a verdict of sound mind and undue influence by votes of nine to three on each issue but with different jurors comprising each vote. The judge sent the jury back for further deliberations, believing that nine identical jurors had to agree on both issues, and the verdict appealed from was reached. Although the court appears to have erred in requiring identical jurors' votes on these issues (Juarez v. Superior Court (1982) 31 Cal.3d 759 [183 Cal. Rptr. 852, 647 P.2d 128]; Resch v. Volkswagen of America, Inc. (1984) 36 Cal.3d 676, 682 [205 Cal. Rptr. 827, 685 P.2d 1178]), the point is not claimed as a basis of error on this appeal, apparently because appellant failed to object below. Where the evidence supports the jury's verdict as recorded, the standard for review cannot be affected by speculation into its basis.
[2] Thus, for example, Dr. Lee, who was not cross-examined on the matter, testified as follows on direct:

"Q.... Do you think from your observation of her on July 17th, 1976, she knew she was signing a will?
"A. Yes, absolutely.
"Q. Do you think that she knew that at the time of the signing of the will she was leaving, with the exception of $5,000, her estate to Roy Smith?
"A. Yes. [¶] I asked her to tell me what the will said and she said well, I leave my  whatever I own to Roy Smith. [¶] And that was my understanding of what the will said, too.
"Q. Did she have any hesitance about knowing who the people were in that room?
"A. No.
"Q. If you had any doubt whatsoever, Doctor, would you have signed your name as a witness to that will?
"A. No."
[3] It should be noted, however, that the court in Nelson had no information as to the symptoms which led to the guardianship and no other basis for concluding that testamentary capacity was lacking (227 Cal. App.2d at pp. 56-57.) If the factors leading to decedent's conservatorship were ones which bear on testamentary capacity, which, as we later discuss, is not here the case, an inference of incapacity might arise as of the date of the proceedings.
[4] Testimony to this effect was provided by appellant, Williams, John Finn, and Vonnie Adcock.
[5] Although Williams stated that decedent told him her dispositive wishes, in discussing the revocation clause of the will he said that while he had no information of previous wills, "All we knew is that she went in a limosine to some lawyer's office for that reason. [¶] I think that's one of the reasons, that  or the reason that revocation clause was placed in there." The "we" can be read as a reference to appellant.
[6] As one commentator has stated, the inclination of juries to set aside wills whose provisions they do not like "can be viewed merely as another ramification of the weaknesses that inhere in the jury system. It is possible, on the other hand, to find a strong element of social protest in so consistent a repudiation of the policy of free testamentary disposition." (Note, Will Contests on Trial (1953) 6 Stan.L.Rev. 91, 102.) Moreover, there are some who contend that the tendency of juries to invalidate wills whose provisions seem to them "`unreasonable, unnatural, foolish or unjust'" should be countenanced, not constrained, because "the common sense instincts of the jury are likely to lead them right in cases of this character." (Laube, The Right of a Testator to Pauperize His Helpless Dependents (1928) 13 Cornell L.Q. 559, 572.) We do no more than acknowledge these analyses of jury resistance, for whatever we might think of their merits (and we express no view) it is not within our office to fashion the accommodations for which they variously argue. If the frequent refusal of juries to be governed by a legal principle rooted in statute (Prob. Code, § 20) does indeed undermine the legitimacy of that principle, as some contend, reconsideration of the rule seems to us more a legislative than a judicial responsibility. Elimination of the right to jury trial in will contests, as others propose, is obviously beyond judicial authority. (See Prob. Code, §§ 371, 382.) (For the historical reasons a majority of American states provide the right to jury trial in such cases  though the right is not granted by the Constitution (Estate of Dolbeer (1908) 153 Cal. 652, 657 [96 P. 266]) nor available under the English common law  see Simes, The Function of Will Contests (1946) 44 Mich.L.Rev. 503, 555-557.)
[7] To the extent this responsibility may necessitate the setting aside of verdicts, we recognize the difficulty it presents to trial judges. "On the one hand, [the trial judge] is charged that the jury's province must remain inviolate so long as there is substantial evidence on the basis of which reasonable men could differ in their conclusions as to the ultimate issues of fact. On the other, he is urged to curb the effect of the jury's prejudice against an `unjust' will by exercising his power to direct and set aside verdicts. In most cases arising in the ordinary course of his work, the trial judge's safest course, when the evidence shows any semblance of a conflict on material points, is to submit the issues to the jury. But in will contests he is more than likely to be reversed when the jury finds against the will, as it usually does. For the trial judge, whose daily routine of personal injury cases, divorce litigation, and creditors' proceedings is only rarely interrupted by a will contest, the result must prove confusing." (Note, Will Contests on Trial, supra, 6 Stan.L.Rev. 91, 95.)
[8] Respondent contends that the proposed instruction was withdrawn, and the clerk's transcript so indicates. The issue of the jury instruction was, however, a basis of appellant's motion for a new trial, and at the hearing on this matter respondent's counsel stated that the instruction had been rejected, and argued the issue on the merits.
[9] "The admission to probate of a will procured by undue influence must be revoked. [¶] Undue influence consists of acts or conduct by which the mind of the testator is overcome by the will of another person. [¶] Mere general influence, not brought to bear on the testamentary act is not undue influence. [¶] In order to constitute undue influence it must be used directly to procured [sic] the will. [¶] It must amount to coercion, destroying the free agency of the testator, substituting for her own another person's will and compelling the testator to make a disposition she would not otherwise have made. [¶] In determining the issue of undue influence you may take into consideration, among other things, evidence which answers these questions: [¶] One, does the will unduly benefit the chief beneficiaries thereof; [¶] Two, is there a variance between the terms of the will and the expressed intentions of the testatrix; [¶] Three, was there an opportunity afforded by the chief beneficiaries' relationship to the decedent to influence the decedent; [¶] Four, was the decedent's mental and physical condition such as to permit an overflowing of her freedom of will; and, [¶] Five, was the chief beneficiaries under the will active in procuring it to be executed." (See BAJI (7th ed.) Nos. 12.15 and 12.16.)
[10] The proposed jury instruction reads as follows: "The contestant has the burden of establishing by a preponderance of the evidence the existence of certain preliminary facts before you apply the rules which I have described as the presumption of undue influence. If you have not been convinced by a preponderance of evidence that all the preliminary facts have been established, then the contestant must have evidence, other than the presumption, to establish undue influence. [¶] The first preliminary fact which must be established is that the fiduciary or proponent carried on some activity which led to the terms of the will in question. Merely affording an opportunity for the preparation of the will, either by taking the testatrix to the attorney or paying for the drafting of the will, does not in and of itself constitute such activity as to give rise to the presumption. [¶] The second preliminary fact which must be established is that the fiduciary conducted some activity concerning the execution of the will, and here again merely taking the testatrix to the attorney is not sufficient in and of itself to raise the presumption of undue influence. [¶] The third preliminary fact that must be established before the presumption becomes evidence is that the fiduciary unduly profits that is[,] that he obtains substantial benefits which would not be the normal expression of the bounty or generosity of the testatrix. [¶] In this regard, you should ascertain whether the testatrix made any expressions at any time showing that she had any other plans to leave her estate different[ly] than that expressed in the will. You may also look to see [the] relationship between the testatrix and the beneficiary, as well as the extent of contact and emotional feelings between the two in determining whether the will represents other than a normal expression of the bounty of the testatrix."
[11] The cases describing the sort of activity that amounts to procuring execution of a will do not expressly refer to "terms" and "execution" of the will as separate elements to be proven, but they do insist on activity in preparation of the will as part of activity in procuring execution of the will. (Estate of Fritschi, supra, 60 Cal.2d 367, 375-376; Estate of Straisinger, supra, 247 Cal. App.2d 574; Estate of Lombardi, supra, 128 Cal. App.2d 606, 612.) The proposed instruction makes express the fact that influence on the contents of the will is a necessary element of a claim of undue influence. It also correctly states that securing an attorney to write the will is in itself insufficient activity. (Estate of Bould, supra, 135 Cal. App.2d 260, 275-276; Estate of Lingenfelter, supra, 38 Cal.2d 571, 586; Estate of Straisinger, supra, 247 Cal. App.2d 574.) While respondent rightly notes that the cases all turn on their particular facts, it remains true that the specific fact stated would not by itself provide sufficient basis for a verdict of undue influence. The instruction in no way precludes the jury from finding undue influence if the evidence discloses activity beyond the mere fact of taking decedent to an attorney.

The proposed instruction also adequately defines undue profit by summarizing the principles established by case law that, on the one hand, an unnatural disposition may be indicated by preference for strangers over relatives, exclusion of close relatives, or divergence from previously stated dispositive intentions (e.g., Estate of Clegg (1978) 87 Cal. App.3d 594, 603 [151 Cal. Rptr. 158]; Estate of Gelonese, supra, 36 Cal. App.3d 854, 866), but on the other hand, a seemingly unnatural disposition may be explained by the actual relationship of the testator to the beneficiaries and excluded parties. (Estate of Jacobs, supra, 24 Cal. App.2d 649, 652; Estate of Wright, supra, 219 Cal. App.2d 164; Estate of Locknane, supra, 208 Cal. App.2d 505, 515.)
[12] The full comment was: "Ladies and gentlemen, you'll be instructed that if he's active in procuring her will, hovering around her, and around the execution, and when he says he's got  he's around when the will is discussed, and making of the will, as I suggest, he says he's not, you'll be instructed that the things that you deem to be active in his procuring a will, that there's a presumption of undue influence because of his confidential relationship."
[13] It has frequently been stated that a court may properly refuse, and is under no obligation to modify, an incorrect or incomplete instruction. (Davis v. Johnson, supra, 128 Cal. App.2d 466, 473; Pedesky v. Bleiberg, supra, 251 Cal. App.2d 119, 124.) But it has also been stated that this is true when the jury has been properly instructed as to the law of the case without the requested instruction. (Roberts v. City of Los Angeles, supra, 109 Cal. App.3d 625, 635, fn. 11; Pedesky v. Bleiberg, supra, 251 Cal. App.2d at p. 124.) Indeed, even cases which do not expressly state this qualification refer in discussion to the fact that the jury had been fully and fairly instructed. (Morris v. Associated Securities, Inc. (1965) 232 Cal. App.2d 220, 231 [42 Cal. Rptr. 607]; Davis v. Johnson, supra, 128 Cal. App.2d 466, 473-474; Tidlund v. Seven Up Bottling Co. (1957) 154 Cal. App.2d 663, 668 [312 P.2d 656].)