Filed 10/25/22  Kovtun v. Kovtun CA4/1
## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA


| | |
|---|---|
| GORDON DAVID KOVTUN, | D079494 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 37-2020-00019715-PR-TR-CTL) |
| KAROLYN KOVTUN, | |
| Defendant and Appellant. | |


APPEAL from an order of the Superior Court of San Diego County, Julia Craig Kelety, Judge.  Affirmed.

Van Dyke & Associates, Richard S. Van Dyke and Geoffrey J. Farwell for Plaintiff and Appellant.

Henderson, Caverly, Pum & Trytten, Kristen E. Caverly, Lisa B. Roper, and Stephen D. Blea for Defendant and Respondent.


## INTRODUCTION

This appeal is the latest in a series of appeals arising from Karolyn Kovtun's ongoing dispute with her brother Gordon Kovtun over the estate of

their parents, Jay and Lael Kovtun.[1] Karolyn has had a contentious relationship with her parents for much of her adult life. In 2008, Jay and Lael amended the Kovtun Family Trust (the Trust) to completely disinherit and remove Karolyn as a beneficiary. More than a decade later, after Lael's death, Karolyn filed a Petition for Instructions Regarding the Validity of the Trust (the Invalidity Petition). She alleged the Ninth, Tenth, and Eleventh Amendments to the Trust were invalid as the product of Gordon's undue influence, and the Eleventh Amendment was also invalid due to fraud in the inducement and Lael's lack of mental capacity.

Gordon, acting in his capacity as trustee, filed a petition to enforce a no-contest clause in the Eleventh Amendment against Karolyn (the No-Contest Petition), and asserted Karolyn brought her Invalidity Petition without probable cause. Karolyn, in turn, filed a motion to strike the No-Contest Petition under the anti-SLAPP (strategic lawsuits against public participation) statute. (Code Civ. Proc., § 425.16.) The trial court denied Karolyn's anti-SLAPP motion and, finding the motion frivolous, awarded sanctions in the form of attorney fees against her.

Karolyn contends the trial court erred in denying her anti-SLAPP motion for three reasons: (1) the trial court improperly overruled her evidentiary objections and relied on inadmissible evidence to determine Gordon provided sufficient support for his claims; (2) Gordon could not establish the requisite minimal merit to his No-Contest Petition because she established a presumption of undue influence that Gordon did not rebut and therefore had probable cause to bring her Invalidity Petition as a matter of

---

[1] We refer to the members of the Kovtun family by their first names to avoid confusion.

law; and (3) the trial court failed to consider her additional grounds for contesting the Eleventh Amendment. Karolyn also asserts the trial court abused its discretion in awarding Gordon sanctions.

We disagree with each of Karolyn's contentions. We find no abuse of discretion in the trial court's ruling on evidentiary objections. And, on our de novo review, we conclude Gordon's No-Contest Petition meets the minimal merit threshold necessary to defeat Karolyn's anti-SLAPP motion. We further find no abuse of discretion in the trial court's order awarding sanctions against Karolyn, as there is substantial evidence to support the court's finding that Karolyn's motion was frivolous. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*Karolyn's Invalidity Petition*

Lael, Karolyn and Gordon's mother, died in April 2020. A few days later, their father Jay issued a mandatory Notification by Trustee pursuant to Probate Code[2] section 16061.7 (the Notification).[3] After receiving the Notification, Karolyn demanded production of Jay and Lael's estate planning file so she could "analyze her interest as a beneficiary of the Trust and *determine whether probable cause existed* to contest the terms of the Trust." (Italics added.) Jay and Lael's attorneys produced copies of the original Trust

---

[2]    All further undesignated statutory references are to the Probate Code.

[3]    Section 16061.7 requires a trustee to serve a notification by the trustee "[w]hen a revocable trust or any portion thereof becomes irrevocable because of the death of one or more of the settlors of the trust." Section 16061.8, in turn, provides "[n]o person . . . may bring an action to contest the trust more than 120 days from the date the notification by the trustee is served upon him or her[.]"

3

and certain amendments to the Trust, but withheld the remainder of the file based on attorney-client privilege. Despite being unable to review the estate planning file, Karolyn filed her Invalidity petition in August 2020, just shy of 120 days after receiving the Notification.

In the Invalidity Petition, Karolyn alleged Jay and Lael established the Kovtun Family Trust in 1976. Over the next 20 years, Jay and Lael amended the Trust five times, but the basic provisions remained the same. So long as Karolyn and Gordon each survived both Jay and Lael, they would each receive equal shares of the principal and income of the Trust.[4]

Karolyn alleged she had a "cold and acrimonious" relationship with Lael for most of her life, but, for decades, Karolyn "enjoyed a loving and warm relationship with . . . Jay." In the late 1990s and early 2000s, Jay and Lael took Karolyn and Gordon on "lavish vacations all over the world," and treated both "equally with respect to their regular gifting patterns." But, at some point, "the relationship between Karolyn and Gordon became irreparably fractured." "As animosity festered, Gordon began taking extraordinary steps to alienate [Karolyn] from their parents." Gordon prevented Karolyn from attending holiday gatherings, and would "berate Jay for having any contact with Karolyn." For almost 12 years, Karolyn "was relegated" to meet with Jay once a week, at a local diner, and had little to no contact with Lael. Although she admitted her relationship with Lael had been acrimonious "for decades," Karolyn alleged both Jay and Lael "were increasingly unable to resist Gordon's domineering acts" to exclude her from the family.

---

[4] As we will discuss in more detail, the Fifth Amendment to the Trust altered the distribution structure to provide additional assets to any child with issue.

4

In 2003, Jay and Lael executed a Sixth Amendment to the Trust, which, Karolyn alleged, was "the result of Gordon's smear campaign to isolate and alienate [her] from her parents." The Sixth Amendment named "the surviving spouse and Gordon" as the sole beneficiaries of the survivor's " 'Trust "B" Residuary Trust,' " and stated, "[a]fter the surviving spouse's death . . . the trustee shall distribute the remaining trust estate to Gordon[.]"

Karolyn became "generally aware" that Jay and Lael had named Gordon as the " 'sole beneficiary' " to the Trust in 2006. In response, Karolyn contacted Jay's longtime friend and estate attorney, Bernard Lewis, and he told her she was "substantially disinherited" by the Sixth Amendment. Karolyn alleged Lewis told her the changes "were the result of pressure exerted upon Jay Kovtun by *Lael* and Gordon." (Original italics omitted, our italics added.) Karolyn believed "Gordon and Lael, who had an icy relationship with her daughter, had planned to disinherit Karolyn, but found Jay . . . to be an obstacle." Thus, Lael and Gordon "convinced Jay to remove Karolyn as a beneficiary of only the 'B' subtrust, which became irrevocable upon the death of the first settlor to die." Karolyn further alleged Lael and Gordon presumed Lael would survive Jay, and planned to "amend the provisions of the 'A' trust following Jay's death to totally disinherit Karolyn."

In the meantime, Jay and Lael executed a Seventh Amendment to the Trust in 2004, expressing their intent "to benefit any lineal survivors," and stating, each "lineal survivor shall share equally with any other lineal survivor." According to Karolyn, Jay and Lael had "evidently reconsidered their decision to disinherit Karolyn," and the " 'lineal survivors' " referenced in the Sixth Amendment included Karolyn, Gordon, and Gordon's two children. Jay and Lael also executed an Eighth Amendment to the Trust in 2007, which did not change the distribution of Trust assets.

5

Then, on May 1, 2008, Jay and Lael executed the Ninth Amendment, disinheriting Karolyn altogether. The same day, Jay and Lael executed a separate statement, explaining why they "ha[d] decided to totally disinherit Karolyn" (the 2008 statement). Jay and Lael explained they had been giving Karolyn and her husband a combined $34,000 each year, but intended to stop; Karolyn had conducted surveillance on Gordon's home and reported him to the city for zoning violations; and they suspected Karolyn was using illegal drugs.[5] Karolyn alleged "[t]he allegations were likely the ideology of Gordon because they are totally incompatible with Jay and Lael's values and beliefs," and thus, she *believed,* "Gordon wrote or otherwise provided a draft of the 'statement' to [Jay and Lael's] attorney, or planted the false ideology in the faltering minds" of Jay and Lael. She alleged further, "[t]he existence of the 'statement' demonstrates Gordon's intimate involvement in, and *active procurement* of, the Ninth Amendment[.]"

Jay and Lael executed a Tenth Amendment in December 2009, which, Karolyn alleged, "was, similarly, the product of Gordon's undue influence." Karolyn acknowledged that Jay and Lael's previous attorney retired in or around 2009, and that she had already been removed as a beneficiary to the Trust at this point. Still, she alleged "Gordon turned Jay and Lael to his own longtime attorneys, [Seltzer Caplan McMahon Vitek (Seltzer Caplan)], to rewrite the trust entirely for his benefit, and effectively remove all relics of [Jay and Lael's] actual testamentary intent," "to reinforce his position as sole

---

[5] Karolyn did not directly dispute the first two stated reasons, but asserted Gordon received similar monetary gifts, and the "alleged surveillance, even if true, had nothing to do with [Jay and Lael's] personal affairs." Karolyn disputed she ever used illegal drugs, and asserted Jay and Lael were also aware that Gordon "was mired in substance abuse problems throughout that same period."

beneficiary," and "to secure his position as sole trustee in the event that Jay and Lael ceased to serve in that capacity."

Karolyn alleged Lael apologized to her in 2017, "and the two tried to put their differences behind them." But, according to Karolyn, "Gordon viewed the reconciliation as a serious threat to his position as sole beneficiary" of the Trust, and "intensified his efforts to push Karolyn out of the family." That August, Jay and Lael executed the Eleventh (and final) Amendment to the Trust. Karolyn alleged "[t]he Eleventh Amendment created a $300,000 specific bequest to [her], but that is only a small fraction of [Jay and Lael's] multimillion-dollar trust estate, and an obvious no-contest clause 'carrot.'" Karolyn alleged "[t]he Eleventh Amendment was also highly suspect," because "Jay and Lael were 86 and 87 years old," and "Lael was practically bedridden and incompetent." In addition, the amendment named Anthony Norton, an employee of Gordon's, as a successor trustee, which she alleged reflected "Gordon's continued attempts to enrich himself with the ultimate control of the trust."

Karolyn further alleged "the Eleventh Amendment was a thinly veiled attempt by Gordon to facilitate his own divorce from [his wife] Annika." In seemingly contradictory statements, Karolyn alleged both that "Gordon and Annika actively concealed their actual separation and imminent divorce" from Jay and Lael, and that Jay and Lael had "been concerned about Gordon and Annika's possible divorce" for years. Karolyn asserted the "Eleventh Amendment was oddly drafted to provide a large specific bequest to Annika, but only so long as she remained married to Gordon," and alleged Gordon "planned to use the items [bequeathed to Annika] as bargaining chips in his imminent divorce," "to give . . . Annika trust assets in lieu of other valuable community property of the marriage."

7

Based on these allegations, Karolyn petitioned the trial court to invalidate the Ninth, Tenth, and Eleventh Amendments.[6] She asserted Jay and Lael were "vulnerable to Gordon's undue influence" when they signed each of the amendments, and both were "suffering from diminished mental capacity" at least by the time they signed the Eleventh Amendment. She alleged Gordon "wielded considerable influence over Jay and Lael" under a durable power of attorney, and because Jay and Lael "relied on Gordon entirely for the choice of their legal representation for estate planning," after their previous attorney retired in 2009. Karolyn asserted she had raised a presumption of undue influence[7] and the burden should be shifted to Gordon to prove the Ninth, Tenth, and Eleventh Amendments "were *not* the product of his undue influence." Karolyn also asserted the Eleventh Amendment was invalid due to fraud in the inducement, based on the alleged concealment of Gordon and Annika's impending divorce, and Lael's lack of mental capacity.

---

[6]    Karolyn also asked the trial court to invalidate the Sixth Amendment if, for any reason, it found the Seventh Amendment to be invalid.

[7]    Under California law, "a presumption of undue influence, shifting the burden of proof, arises upon the challenger's showing that (1) the person alleged to have exerted undue influence had a confidential relationship with the testator; (2) the person actively participated in procuring the instrument's preparation or execution; and (3) the person would benefit unduly by the testamentary instrument." (*Rice v. Clark* (2002) 28 Cal.4th 89, 96–97 (*Rice*).)

8

## II.

### *Jay's Response to Karolyn's Invalidity Petition*

Jay, as settlor and trustee of the Trust, filed an Objection and Response to Karolyn's Invalidity Petition.[8] He asserted the Invalidity Petition was "the fourth in a series of baseless legal actions brought by [Karolyn] to harass . . . [him and] the rest of her estranged family members."[9] He argued it defied logic "to presume that both Jay and Lael lacked mental capacity and were unduly influenced by Gordon for nearly 20 years," and that Karolyn's claims were "factually unsubstantiated" and "legally without merit." He also requested the trial court make a finding Karolyn had violated the no-contest clause in the Eleventh Amendment.

Jay asserted he and Lael had "consistently expressed their desire to either limit or completely eliminate what Karolyn would receive under the terms of their Trust since 2003," but Karolyn had "a longstanding, deeply-rooted hostility for her mother, brother, and sometimes her father," which "led to ever increasing battles" and acts of retaliation against Jay and Lael's estate planning decisions. Karolyn's "decades of animosity toward her family [had] created a fractured family dynamic," that had only "worsened as

---

[8] Jay filed the original Objection and Response to the Invalidity Petition, but Gordon subsequently replaced Jay as trustee, and filed his own No-Contest Petition, which is the subject of Karolyn's anti-SLAPP motion. Jay died in December 2021, while the present appeal was pending.

[9] As Karolyn acknowledged in the Invalidity Petition, she previously filed a petition for appointment of a conservator for Jay, a petition alleging Jay was unable to serve as trustee of the Trust, and another petition regarding a separate irrevocable life insurance trust. She voluntarily dismissed the petition for conservatorship (in favor of the petition seeking to remove Jay as trustee), but the other two petitions were pending at the time Karolyn filed her Invalidity Petition.

9

Karolyn's behavior [became] increasingly erratic." Further, Karolyn "took advantage" of Jay's attempts to maintain a relationship with her and "solicited significant and generous financial gifts from Jay, including convincing Jay to pay off her mortgage in 2017 and soliciting a loan for $40,000 in July of 2019, which she never repaid." Despite those gifts, "Karolyn's erratic behavior" only escalated.

Jay also noted—contrary to Karolyn's assertion that the first five amendments to the trust contained "substantially identical dispositive provisions"—that he and Lael demonstrated their intent "to not distribute their assets equally to both children as far back as 1995." As he explained, "[u]nder the Fifth Amendment, after the surviving spouse's death, a surviving child with issue would receive one-half of the principal, while a surviving child without issue would receive only the net income from the other half of the principal for life. At that child's death, the remaining principal would go to the other child, if then living, or to his issue." Thus, the Fifth Amendment "evidenced Jay and Lael's intent to bequest a larger portion of their assets on the child with issue." That intention was consistent with the Seventh Amendment, in which Jay and Lael explicitly stated that Gordon's two children would share equally in the trust estate.

Jay further asserted that "[f]or years, [he and Lael] consistently manifested an intent that Karolyn take a smaller share of their estate because Karolyn has no children and [he and Lael] believed that the $2.5 million she is expected to receive pursuant to the terms of [a life insurance policy] should be sufficient, especially as [he] had already paid off her mortgage and had been extremely generous with annual gifts over the years." Further, "Karolyn's hostile and volatile relationship with her parents [was] a significant source of pain and frustration, further explaining the desire to

10

leave a larger share of the Estate to their son and his children, with whom they have had a very close and loving relationship." Thus, he asserted "Karolyn can neither establish a presumption of undue influence nor make out a prima facie case of the statutory factors. When the Ninth, Tenth, and Eleventh Amendments were executed, Jay and Lael were not vulnerable, close to death or isolated from other family members. Moreover, there was no inequitable result."

Jay resigned as trustee in January 2021, and Gordon accepted the position as successor trustee. That same month, acting as successor trustee, Gordon joined in Jay's objections to Karolyn's Invalidity Petition.[10]

### III.

### *Gordon's No-Contest Petition*

In April 2021, Gordon filed the No-Contest Petition, as successor trustee of the Trust, asking the trial court to enforce the no-contest provision in the Eleventh Amendment against Karolyn, or, in the alternative, to allocate the costs of the litigation to Karolyn's share. Like Jay, Gordon alleged Karolyn had known for a long time that Jay and Lael had disinherited her from the Trust, and her allegations of invalidity had "absolutely no factual basis." He asserted Karolyn's own written communications with Jay demonstrated she was well aware her parent's estate planning choices "were intentional, deliberate, and a result of the strained relationship that [she] maintained with her family for her entire life."

Among other exhibits, Gordon attached a 2009 email exchange between Jay and Karolyn, in which Jay told Karolyn he no longer wanted to have a

---

[10] Gordon had previously joined in the objections in his personal capacity.

11

relationship with her, because of her hostile behavior. Karolyn responded to her father: "Your relationship with me ended 10 years ago. I just hadn't become aware of it yet because you just didn't have the integrity or honesty to say it to my face." In another email to Jay in 2019, Karolyn said, "the undeniable favoritism that you have demonstrated towards my brother *my entire life* has been utterly disgusting and dysfunctional." (Italics added.)

Gordon asserted that, despite Karolyn's many contentious exchanges with their parents, Karolyn never told her parents she believed they were being unduly influenced by Gordon, or that they lacked mental capacity to make their own decisions. Rather, she accepted large sums of money from Jay as recently as May 2017. So Gordon asserted "Karolyn's claims of undue influence, fraud, and lack of capacity have no factual or legal basis and the [Invalidity Petition] was brought without probable cause."[11]

## IV.

### *The Anti-SLAPP Proceedings*

A. *Karolyn's Anti-SLAPP Motion*

Karolyn filed a special motion to strike the No-Contest Petition pursuant to the anti-SLAPP statute, Code of Civil Procedure section 425.16.[12] In her motion, Karolyn alleged the anti-SLAPP statutory scheme

---

[11] Pursuant to section 21311, subdivision (a), "[a] no[-]contest clause shall only be enforced against" three specific types of contests, including a "direct contest that is brought without probable cause." (See also *Key v. Tyler* (2019) 34 Cal.App.5th 505, 522 (*Key*) [holding a party bringing a no-contest petition has the burden of showing their opponent brought the contest without probable cause].)

[12] The anti-SLAPP statute provides a mechanism to protect defendants from meritless lawsuits that chill their exercise of constitutional rights to speech and petition. (Code Civ. Proc., § 425.16, subd. (a); see *Wilson v. Cable*

12

applied because Gordon's No-Contest Petition was a "direct attack" on her "constitutional right to petition and to free speech." To establish even the minimal merit required to overcome her motion to strike, Karolyn asserted Gordon would have to establish that she brought her Invalidity Petition without probable cause. She acknowledged Gordon would "undoubtedly argue that it was [her] behavior that caused her parents to drastically limit, then disinherit her almost entirely," but alleged she "filed her [p]etition after careful consideration and more than enough probable cause." She asserted that she "established a *prima facie* case of undue influence" in her Invalidity Petition, and Gordon would have to overcome that presumption to establish she did not have probable cause. (Boldface omitted.) Karolyn also asserted she had probable cause to assert the Eleventh Amendment was invalid as a result of fraud in the inducement and Lael's lack of mental capacity.

Karolyn submitted her own declaration in support of the motion to strike, which echoed the same allegations as the Invalidity Petition and her motion to strike. She also submitted an attorney declaration with a number of exhibits, including a durable power of attorney in favor of Gordon executed in August 2017, the Seventh through Eleventh Amendments to the Trust, the 2008 statement executed by Jay and Lael, medical records regarding Jay and Lael from 2020, and a number of legal documents pertaining primarily to discovery surrounding the Invalidity Petition. Finally, she asked the court to

_____

*News Network, Inc.* (2019) 7 Cal.5th 871, 883–884; *Baral v. Schnitt* (2016) 1 Cal.5th 376, 384 (*Baral*).) To prevail, the moving party must first demonstrate that the challenged claims arise from protected activity. (*Baral,* at p. 396.) If the moving party makes that threshold showing, the burden shifts to the plaintiff, or here, the petitioner, "to demonstrate that each challenged claim based on protected activity is legally sufficient and factually substantiated." (*Ibid*.)

take judicial notice of the prior pleadings in the case, including her Invalidity Petition, Jay's objections and response, and Gordon's No-Contest Petition.

B.    *Gordon's Opposition and Request for Sanctions*

Gordon opposed Karolyn's anti-SLAPP motion. He did not dispute that his No-Contest Petition arose from protected activity, but asserted the claims in the petition met the minimal merit threshold required to survive the second step of the anti-SLAPP analysis. He argued Karolyn's own admissions—including that her relationship with Lael was " 'fraught with acrimony for decades' " and that "Lael herself convinced [Jay] to disinherit Karolyn"—demonstrated Karolyn could not have reasonably believed her Invalidity Petition had merit. He argued further that Karolyn's bare allegations, asserted only " 'on information and belief,' " were insufficient to demonstrate probable cause.

Gordon submitted declarations to support his opposition to the anti-SLAPP motion from Jay; Jay and Lael's estate planning attorney, Rhonda Crandall; Jay's sister, Edie Culiner; and attorney Kristen Caverly. Jay affirmed, in his declaration, that he and Lael had a difficult relationship with Karolyn for most of her life. He averred they decided to remove Karolyn as a beneficiary to the Trust in 2003 because they believed the large payout she would receive from their life insurance policy "was enough given how hard it is for Karolyn to get along with [their] family and given that Gordon has children to carry on the Kovtun legacy while Karolyn does not." Jay explained that Crandall drafted the Eleventh Amendment after meeting with him and Lael, and the amendment reflected his and Lael's wishes. They left Karolyn $300,000, and no more, from the Trust and it was their wish that "Karolyn would forfeit her inheritance if she contested the validity of the

14

trust because [they] did not want [their] son Gordon to have to be in lawsuits with Karolyn after [they] died."

Crandell confirmed Jay's declaration. She averred that Seltzer Caplan represented Jay and Lael "off and on for over four decades" and a lawyer from the firm drafted the original Kovtun Family Trust in 1976. Crandell started representing Jay and Lael in 2009, after their previous lawyer retired. At their initial meeting, Jay and Lael gave Crandell a copy of their 2008 statement and explained why they were not including Karolyn as a beneficiary to the Trust. Crandall drafted the Tenth and Eleventh Amendments. She met with Jay and Lael each time, and "saw no indication that Gordon Kovtun was exerting undue influence" over either of them. Jay and Lael told her that their primary reasons for executing the Eleventh Amendment were to include a gift to Karolyn to deter her from contesting the Trust, and to limit the gifts to Annika based on the status of her marriage to Gordon, because they "were aware that Gordon and Annika were having marital difficulties at that time."

Culiner averred she maintained a separate relationship with Karolyn over the years, and had personal knowledge of Karolyn's conflicted relationship with Jay and Lael. She provided copies of numerous emails in which Karolyn openly berated both of her parents. In a 2018 email, Karolyn wrote: "Lael was an abusive bitch to me my entire life. Jay gladly cosigned her behavior because that's what made her happy. *That's why he's going along with this estate plan.* Whatever. I have already resigned myself to the fact that I'm not getting anything other than the life insurance." (Italics added.) She continued, "[Jay] and Lael have always wanted me out of the family my entire life. Now [Jay has] got his wish."

15

Caverly provided discovery responses authenticating additional documents, including the 2009 email exchange between Jay and Karolyn that Gordon had attached to his No-Contest Petition.[13] As we previously noted, in that email exchange, Jay told Karolyn he no longer wanted to have a relationship with her because of her hostile behavior towards the family.

Finally, Gordon pointed out that Karolyn had previously filed a conservatorship petition against Jay, and knew "the court investigator found no evidence of fraud, undue influence or lack of capacity." Gordon asked the court to take judicial notice of the investigator's findings, and asserted "[e]verything" in the files from the conservatorship proceedings was further evidence of a lack of probable cause supporting Karolyn's Invalidity Petition. He asserted further that "Karolyn should be sanctioned under California Code of Civil Procedure section 425.16[, subdivision ](c) as this is at least the third case in which Karolyn has filed a frivolous anti-SLAPP motion to delay proceedings rather than to protect her free speech or freedom to petition."

C.    *Karolyn's Reply*

Karolyn's primary contention in her reply was that Gordon's evidence was not competent or admissible, and was therefore insufficient to support

---

[13]    Caverly also provided additional detail regarding the prior litigation between the parties, Karolyn's alleged prior abuses of the anti-SLAPP statute, Karolyn's allegedly improper use of the anti-SLAPP stay in this case, and the attorney fees incurred to defend against Karolyn's anti-SLAPP motion. Gordon separately requests that we take judicial notice of a number of documents attached to Caverly's declaration. We deny Gordon's request, since Caverly's declaration is already in the appellate record, and the additional documents are not necessary for resolution of the present appeal. (See *Guarantee Forklift, Inc. v. Capacity of Texas, Inc.* (2017) 11 Cal.App.5th 1066, 1075 [appellate court "may decline to take judicial notice of matters not relevant to dispositive issues on appeal"].)

his claim that she lacked probable cause to bring the Invalidity Petition. Karolyn raised general objections regarding the admissibility of each of the declarations Gordon submitted in support of his opposition, and included a separate set of 35 objections to specific statements and exhibits in the declarations. Karolyn also asserted, in a conclusory fashion, that Gordon failed to rebut the presumption of undue influence.

D.    *The Trial Court's Ruling*

The trial court denied Karolyn's motion to strike the No-Contest Petition, and granted Gordon's request for sanctions in the form of attorney fees in the amount of $48,875 pursuant to Code of Civil Procedure sections 128.5 and 425.16, subdivision (c).

The trial court began by granting both party's unopposed requests for judicial notice, and rejecting Karolyn's evidentiary objections. It then listed the evidence it considered, including the declarations presented by Gordon, the written communications to and from Karolyn regarding her relationship with Jay and Lael, the records from the conservatorship case, and the admissions in Karolyn's own Invalidity Petition.

Accepting the evidence as true, as it must, the trial court found Gordon had demonstrated there had been "a longstanding conflict between Karolyn and her parents that was known to Karolyn" and "minimal contact between Karolyn and Lael at the time that the Eleventh Amendment was executed and in the preceding years." The court ruled Gordon met his burden of showing the No-Contest Petition "has the requisite minimal merit to survive an anti-SLAPP motion." It explained the evidence "could support a finding that the Invalidity Petition was brought without probable cause because it could show that: (1) Jay and Lael's estate plan was based on their relationship with Karolyn instead of fraud, undue influence, or lack of

17

capacity; and (2) Karolyn was aware of this relationship when she filed the Invalidity Petition." Rejecting Karolyn's assertion regarding the presumption of undue influence, the court explained the "presumption does not entitle Karolyn to judgment as a matter of law," but "merely shifts the burden of proof" at trial.

The trial court further found the motion to strike "was totally and completely without merit," as the evidence "easily surpasses" the requisite showing of minimal merit. Further, "Karolyn was well aware of the evidence of the long conflict, because most of this evidence is in the form of communications to and from her." Accordingly, the court concluded "the anti-SLAPP motion was frivolous, and sanctions [were] mandatory." Karolyn timely appealed.

DISCUSSION

I.

*The Trial Court Properly Denied Karolyn's Anti-SLAPP Motion*

We review the trial court's order denying Karolyn's anti-SLAPP motion under a de novo standard of review, and "employ the same two-step procedure as did the trial court" to determine whether the motion was properly denied. (*Gerbosi v. Gaims, Weil, West & Epstein, LLP* (2011) 193 Cal.App.4th 435, 444; *Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3 (*Soukup*).) Here, Gordon does not dispute that Karolyn met her burden on the first step.[14] So our analysis is limited to the second step.

In the second step, "the burden shifts to the plaintiff [or, in this case, Gordon as the petitioner] to demonstrate that each challenged claim based on

---

[14] Although there may be compelling reasons "in favor of exempting

18

protected activity is legally sufficient and factually substantiated. The court, without resolving evidentiary conflicts, must determine whether the [petitioner's] showing, if accepted by the trier of fact, would be sufficient to sustain a favorable judgment. If not, the claim is stricken." (*Baral, supra,* 1 Cal.5th at p. 396.) Like the trial court, "we neither 'weigh credibility [nor] compare the weight of the evidence. Rather, [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law.' " (*Soukup, supra,* 39 Cal.4th at p. 269, fn. 3.) "The plaintiff need only establish that his or her claim has 'minimal merit.' " (*Id.* at p. 291.)

Here, the trial court concluded the evidence Gordon presented "easily surpasses" the requisite showing of minimal merit. Karolyn asserts three reasons we should reach a different conclusion on appeal, each of which we reject. On our own independent review, we conclude Gordon has established more than the minimal merit necessary to defeat the anti-SLAPP motion.

A.    *The Trial Court Properly Overruled Karolyn's Evidentiary Objections*

First, Karolyn asserts the trial court improperly overruled her evidentiary objections and, thus, relied on inadmissible evidence when evaluating the merit of Gordon's No-Contest Petition. Although we independently review the merits of Gordon's claims under the second step of the anti-SLAPP analysis, we defer to the trial court's ruling on evidentiary challenges and disturb the trial court's evidentiary rulings only if there has been an abuse of discretion. (See *Jay v. Mahaffey* (2013) 218 Cal.App.4th

---

actions to enforce no[-]contest provisions from the scope of the anti-SLAPP statute," the Legislature has not done so. (*Key, supra,* 34 Cal.App.5th at p. 522.) Thus, at least two courts have held, " 'the plain language of the anti-SLAPP statute applies' to petitions to enforce no[-]contest clauses." (*Id.* at p. 518, quoting *Urick v. Urick* (2017) 15 Cal.App.5th 1182, 1186.)

1522, 1536 ["With respect to evidentiary challenges submitted in connection with an anti-SLAPP motion, we review the trial court's rulings for abuse of discretion."].)  We find none.

In her reply to Gordon's opposition to her motion to strike, Karolyn asserted, generally, that Gordon's evidence was "inadmissible and incompetent."  Karolyn addressed each of the declarations Gordon submitted and argued:  (1) the emails attached to Culiner's declaration, "which purport to be email exchanges between Karolyn and [Culiner]," were not admissible because they had not been authenticated by Karolyn;  (2) Jay could not testify on Lael's behalf, or to Lael's state of mind; (3) any testimony from Crandall *or* Jay regarding Jay and Lael's estate planning was inadmissible because Seltzer Caplan had not complied with a subpoena for the production of business records;[15] (4) Crandall's statements about undue influence and mental capacity were improper legal conclusions; and (5) any evidence of prior litigation submitted by attorney Caverly was inadmissible character evidence.

Concurrent with the reply, Karolyn filed a separate set of 35 specific objections to Gordon's evidence.  Karolyn asserted specific objections to several statements in the declarations submitted by Jay, Crandall, and Culiner, and to 19 of the 23 emails attached to Culiner's deposition.  Each objection was asserted on some combination of the following grounds:  lack of personal knowledge, insufficient foundation, calls for expert opinion or speculation, calls for a legal conclusion, inadmissible hearsay, or authentication.  In its order denying Karolyn's motion to strike, the trial

---

[15]     Karolyn noted that "a Motion to Enforce the Subpoena [was] currently pending before the discovery referee."

20

court noted "Karolyn has filed numerous objections to the evidence submitted by Gordon," and stated, "[a]ll of those objections lack merit and are overruled."

The declarations and exhibits Gordon relied upon are consistent with the type of evidence typically submitted in opposition to motions to strike under the anti-SLAPP statute. Because anti-SLAPP proceedings are necessarily preliminary in nature, and typically occur *before* discovery, the party opposing the motion does not have a full opportunity to definitively establish the authenticity or admissibility of the proffered evidence. As our high court has recently explained, "at the second stage of an anti-SLAPP hearing, the court may consider affidavits, declarations, and their equivalents if it is *reasonably possible* the proffered evidence set out in those statements will be admissible at trial." (*Sweetwater Union High School Dist. v. Gilbane Building Co.* (2019) 6 Cal.5th 931, 949 (*Sweetwater*), italics added.) It is appropriate for a trial court to decline to consider evidence submitted in response to an anti-SLAPP motion only where that evidence "*cannot* be admitted at trial, because it is categorically barred or undisputed factual circumstances show inadmissibility." (*Ibid.*)

Here, it is readily apparent from even a cursory review of Karolyn's objections that many of them were without merit. For example, Karolyn objected to Crandall's statements that she drafted the Tenth Amendment and personally met with Jay and Lael before they signed it as lacking personal knowledge and calling for expert opinion, speculation, or a legal conclusion. She raised similar objections to Jay's statements that he had a difficult relationship with Karolyn but still gave her many financial gifts over the years. On their face, these statements are indisputably based on the personal knowledge of the declarant, and do not call for an expert opinion,

21

speculation, or a legal conclusion, as Karolyn asserted. Karolyn also objected to Crandall's statements regarding her meetings with Jay and Lael as hearsay and calling for an expert opinion, but those statements would likely be admissible at least to prove Jay and Lael's existing mental state.[16] (See Evid. Code, § 1250, subd. (a); *Estate of Aiello* (1980) 106 Cal.App.3d 669, 676 [letters regarding decedent's testamentary wishes admissible to prove declarant's then existing mental state].)

We acknowledge at least some of Karolyn's objections are not meritless on their face. But those objections still fail because it is reasonably possible, even likely, they will be resolved through the discovery process. (See *Sweetwater, supra,* 6 Cal.5th at p. 949.) For example, Karolyn asserted the emails attached to Culiner's declaration had not *yet* been authenticated, but of course they could easily be authenticated at, or before, trial. Notably, though, Karolyn does not assert the emails are somehow fabricated or otherwise allege they would not be admissible with authentication at trial. Indeed, Karolyn has already authenticated some of the emails between herself and Jay, and it is likely Gordon would be able to authenticate the rest at trial. Similarly, any issues regarding Seltzer Caplan's compliance with the subpoena for the production of business records would certainly be resolved by the time of trial. Karolyn does not contend otherwise.

---

16     In her briefing on appeal, Karolyn generally asserts certain statements or evidence offered by Crandall, Jay, and Culiner were inadmissible, but she does not tie her arguments to the objections she raised at trial, or offer any argument as to why the trial court erred in overruling any *specific* objection. "We are not bound to develop appellants' arguments for them," and may treat assertions unsupported by reasoned argument or authority as waived. (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830; *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852.)

Relying on *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 255, Karolyn asserts the trial court erred by issuing a "blanket" ruling that failed to address the merits of her individual objections. The holding in *Nazir* is not as broad as Karolyn suggests. There, the trial court *sustained* 763 of the 764 evidentiary objections raised by the defendants in the context of a motion for summary judgment. (*Id*. at pp. 254–255.) On appeal, the plaintiff asserted "the trial court's blanket ruling" was error, and the appellate court agreed. (*Id*. at p. 255.) However, the appellate court's ruling was not based simply on the trial court's *failure* to provide an independent ruling on each objection. Rather, the appellate concluded the trial court could not have *properly sustained* at least some of the objections. As the court noted, "[s]ome of the sustained objections were to plaintiff's testimony about [facts to which he surely had personal knowledge such as] his dates of employment, his religion, his skin color, and his national origin," "[o]ver 250 of the sustained objections failed to quote the evidence objected to," and 27 of the sustained objections "were to plaintiff's brief, not his evidence," and "[s]ome of the sustained objections did not even assert any basis for the objection!" (*Id*. at pp. 255–256.)

Here, the trial court *overruled* Karolyn's evidentiary objections, and did so in the context of an anti-SLAPP proceeding. And, here, much like the objections the trial court improperly sustained in *Nazir*, the majority of Karolyn's objections were patently without merit. We conclude the trial court did not abuse its discretion by overruling Karolyn's objections, and thus the trial court did not err in considering the evidence in determining that Gordon had established his claims met the minimal merit threshold to overcome the anti-SLAPP motion. But as we will explain next, even if the trial court had struck the declarations of Jay, Crandall, and Culiner in their entirety, the

remaining evidence was sufficient on its own to deny Karolyn's anti-SLAPP motion.

B.    *Gordon Established the Claims in His No-Contest Petition Had at Least Minimal Merit*

We next consider, viewing the evidence in Gordon's favor as true, whether it was sufficient to establish the requisite minimal merit to overcome the second step of the anti-SLAPP analysis.  Like the trial court, we have no trouble concluding the evidence here was more than sufficient to overcome Karolyn's anti-SLAPP motion.

Section 21311, subdivision (a)(1), expressly permits enforcement of a no-contest clause against a "direct contest that is brought without probable cause."  Probable cause exists under the statute if, "at the time of filing a contest, the facts known to the contestant would cause a reasonable person to believe that there is a reasonable likelihood that the requested relief [in the action] will be granted after an opportunity for further investigation or discovery."  (§ 21311, subd. (b).)

Here, it is undisputed the Eleventh Amendment contained a no-contest clause that stated, in relevant part, "[e]ach beneficiary . . . who at any time, without probable cause, contests the validity of or seeks to invalidate any provisions of . . . this Trust . . . is hereinafter referred to as a 'contestant,' " and "[t]he settlors hereby revoke every gift and all other benefits given by this Trust to each beneficiary . . . who is a contestant."  It is also undisputed that Karolyn's Invalidity Petition was a direct contest which sought to invalidate one or more provisions of the Trust.

The sole question we must address in evaluating the merits of Gordon's No-Contest Petition is whether, accepting all evidence favorable to Gordon as true, the evidence was sufficient to sustain a finding that Karolyn brought her Invalidity Petition *without probable cause*.  Put another way, it is

24

whether a reasonable person, standing in Karolyn's shoes at the time she filed the Invalidity Petition, would have believed there was a reasonable likelihood that the trial court would grant the relief she requested. (§ 21311, subd. (b).) We need not look much further than the Invalidity Petition itself to answer that question. Karolyn's own admissions, and obvious deficiencies, appearing on the face of the pleading suggest no reasonable person in Karolyn's position would expect to prevail.

Karolyn's primary assertion in the Invalidity Petition is that the Sixth, Ninth, Tenth, and Eleventh Amendments to the Trust are invalid because of Gordon's undue influence over Jay and Lael. To prevail on that claim, Karolyn would need to show that Gordon's influence on their parents was "sufficient to overcome [their] free will, amounting in effect to coercion destroying [their] free agency." (*Rice, supra,* 28 Cal.4th at p. 96.) But, in the Invalidity Petition, Karolyn herself conceded she knew all along that it was her own "cold and acrimonious" relationship with Lael, and to a lesser extent Jay, that was the true driving force behind Jay and Lael's decision to disinherit her and exclude her from the Trust.

Karolyn alleges Gordon "*began* taking extraordinary steps to alienate [her] from [her] parents," after her relationship with Gordon became "irreparably fractured" sometime in the early 2000s. But she admits her relationship with Lael "had been fraught with acrimony *for decades,*" long before any falling out with Gordon. (Italics added.) Karolyn admitted she learned Jay and Lael intended to exclude her as a beneficiary to the Trust as early as 2006, and, again, by her own admission, Jay and Lael's estate planning attorney told her the changes "were the result of pressure exerted upon Jay Kovtun by *Lael* and Gordon." (Original italics omitted, our italics added.) Karolyn admitted Lael sought to "convince[ ] Jay to remove [her] as a

25

beneficiary," at least to the " 'B' subtrust" because of her "icy relationship" with Karolyn, but provides no real explanation as to Gordon's involvement or motivation. She simply alleges, in a conclusory fashion, that it was "Lael *and* Gordon" that exerted pressure on Jay.

Karolyn further admitted that Jay and Lael were represented by their own competent counsel when they executed the Ninth Amendment in 2008, and that they signed *and notarized* the 2008 statement that same day setting forth their reasons for disinheriting Karolyn. Karolyn asserts, solely on information and belief, that the 2008 statement was a result of Gordon having "planted the false ideology in the faltering minds" of Jay and Lael. Karolyn's bare assertions are facially insufficient to support her claims. (See *Gomes v. Countrywide Home Loans, Inc.* (2011) 192 Cal.App.4th 1149, 1158–1159 ["[A] pleading made on information and belief is insufficient if it 'merely assert[s] the facts so alleged without alleging such information that "lead[s] [the plaintiff] to believe the allegations are true." ' "]; *Estate of Mann* (1986) 184 Cal.App.3d 593, 608–609 (*Mann*) [" ' "[A] will cannot be overturned on the mere speculation or suspicion that undue influence may have been used to procure it." ' "].)

Further, although not included in the Invalidity Petition itself, Karolyn admitted the authenticity of the email Jay sent her in 2009, which Gordon attached as an exhibit to his No-Contest Petition. In the email, Jay expressed his desire to distance himself from Karolyn because of her own hostile behavior. Jay explained to Karolyn: "It is clear that, at best, you and I have a conflicted relationship and that you seek to have only hostile relationships with your mother and brother. Your behavior, over time, has created the need to put an end to these relationships, conflicted, hostile, or otherwise. Therefore, from this point forward, let us not have a relationship.

26

[¶] You will still get your 50% [share of] the life insurance proceeds." As the trial court found, the email is unassailable evidence that Karolyn knew, in 2009, that her inheritance was limited to the life insurance policy and that Jay wished to cut off contact with her *because of her own behavior* towards him, Lael, and Gordon.

Karolyn also does not dispute the authenticity of a check for over $300,000 that Jay gave her to pay off her mortgage in May 2017, *after* executing the Ninth and Tenth Amendments and not long before executing the Eleventh Amendment. Karolyn admittedly had no problem accepting large sums of money from Jay during the same period of time in which she asserts his free will had been overcome and his free agency destroyed. (See *Rice, supra,* 28 Cal.4th at p. 96 ["Undue influence is pressure brought to bear directly on the testamentary act, sufficient to overcome the testator's free will, amounting in effect to coercion destroying the testator's free agency."].)

Further still, Karolyn acknowledges she filed a petition for conservatorship over Jay in 2019 *before* the filing of the Invalidity Petition. During those proceedings, a medical doctor submitted a capacity declaration averring that Jay had *no impairments*, and Jay himself testified he did not want Karolyn at the house because "she's just a very disruptive person." In his opposition to the anti-SLAPP motion, Gordon asked the trial court to take judicial notice of the conservatorship proceedings, and asserted the investigator found "no evidence of undue influence or lack of capacity."[17] In its ruling denying her anti-SLAPP motion, the trial court confirmed the

---

[17] The conservatorship proceedings were before the same trial court judge, but the report was confidential and therefore not reproduced in the record in this case, as noted in Caverly's declaration and Gordon's request for judicial notice.

investigator's report had recommended the court deny the conservatorship petition. Karolyn does not dispute she had knowledge of those proceedings, including the investigator's report, nor does she dispute Gordon's characterization of the investigator's findings.

Considering only Karolyn's own admissions, along with a handful of documents she concedes are authentic, we have no trouble concluding Gordon established at least a reasonable probability of prevailing on his claim that Karolyn brought the Invalidity Petition without probable cause. (See Code Civ. Proc., § 425.16, subd. (b)(1) ["A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech . . . shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."]; *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 61 [plaintiff must show " 'a reasonable probability of success on the merits' "].) Taken as true, the evidence shows no reasonable person, standing in Karolyn's shoes and knowing what she knew at the time she filed her Invalidity Petition, would reasonably believe she had probable cause to assert the disputed amendments were the product of Gordon's undue influence. Rather, as Karolyn herself implicitly concedes, she knew the true driving force behind the change was her decades-long fractured relationship with her parents.

Still, to the extent any doubt remains regarding whether Karolyn knew the true reason Jay and Lael removed her as a beneficiary from the Trust at the time she filed the Invalidity Petition, the additional evidence submitted by Gordon in support of his opposition further strengthens his position that she did. In an email to Culiner in 2018, two years before she filed the Invalidity Petition, Karolyn said: "In the last month, I have had to

28

completely re-evaluate my relationship with my father and I see now that it was all a big fucking fake illusion. He knew about [Lael's] abuse and he did nothing about it, because if he let her continue to abuse me, then he didn't have to deal with Lael's bullshit. He sacrificed his daughter for his hole of a wife. *The three of them* [(Jay, Lael and Gordon)] *have wanted me out of the family my entire life and that's undeniable in light of the estate plan.*" (Italics added.) In 2019, Karolyn said, "[t]he fact that they are leaving all their personal property to Gordon is done to deliberately hurt me, *there is absolutely no other explanation for doing that.*" (Italics added.) She went on to characterize the disinheritance as "the functional equivalent of getting an 'f' as a final grade from a parent," and said, "I hope that you do not disclose how hurt I am to [J]ay, as that will only secretly delight him and I do not wish to give him that sadistic satisfaction."

As Gordon asserted in his opposition to the anti-SLAPP motion, "[a] reasonable person could not ignore the lack of contact between mother and daughter for more than a decade or ignore their own writings about their relationship with the settlor to believe they could successfully prove it was someone else that caused unequal gifts." We agree. Accordingly, we conclude Gordon has established more than the minimal merit necessary to support his claim that Karolyn filed the Invalidity Petition without probable cause and defeat an anti-SLAPP motion.

C.     *Karolyn's Assertions To the Contrary Lack Merit*

Karolyn fails to address the evidence presented by Gordon, or her own admissions, head on. Instead, Karolyn argues, essentially, that none of the evidence matters. She asserts we must conclude that she *did* have probable cause to bring her Invalidity Petition *as a matter of law* because she raised a presumption of undue influence that Gordon did not rebut. Failing that, she

29

asserts she at least had probable cause for her additional, ancillary claims that the Eleventh Amendment was invalid due to fraud or Lael's lack of mental capacity. Both arguments fail.

### 1. *The Presumption of Undue Influence*

"Although a person challenging the testamentary instrument ordinarily bears the burden of proving undue influence . . . a presumption of undue influence, shifting the burden of proof [to the opponent], arises upon the challenger's showing that (1) the person alleged to have exerted undue influence had a confidential relationship with the testator; (2) the person actively participated in procuring the instrument's preparation or execution; and (3) the person would benefit unduly by the testamentary instrument." (*Rice, supra,* 28 Cal.4th at pp. 96–97.)

Here, Karolyn argued in her anti-SLAPP motion that she demonstrated probable cause for her claim of undue influence because she presented facts sufficient to raise a presumption of undue influence. Karolyn asserted: (1) Gordon had a confidential relationship with Jay and Lael, as evidenced by his status as a fiduciary and his control and manipulation of Jay and Lael; (2) Gordon was present at and " 'essential' " to the estate planning sessions between Jay and Lael and their attorney and, further, Gordon "intentionally withheld relevant evidence . . . which would further establish [his] involvement in the procurement of the Ninth, Tenth, and Eleventh Amendments"; and, (3) Gordon obtained undue benefits as the sole beneficiary of the Trust estate. In opposition, Gordon asserted "Karolyn's allegations of undue influence and lack of capacity lack personal knowledge." As we have discussed, Gordon presented ample evidence to support his contention that Karolyn was well aware the disputed amendments were the product of Jay and Lael's own wishes, and not any undue influence. Yet, in

30

her reply to his opposition, Karolyn asserted, in a conclusory fashion, that Gordon failed to rebut the presumption of undue influence.

Karolyn maintains this position on appeal and asserts the Invalidity Petition "establishe[d] a prima facie case to shift the presumption of undue influence to *Gordon*," and therefore "provides Karolyn with *probable cause* to maintain her [Invalidity] Petition as a matter of law." (Boldface omitted.) She further asserts, as she did in the trial court, that Gordon failed to rebut the presumption in his opposition papers, and that her "prima facie case shifting the presumption of undue influence to Gordon" requires judgment in her favor "as a matter of law," because "Gordon would have been *presumed* to have unduly influenced the settlors at the time of trial on her claims." (Boldface omitted.)

Karolyn's argument suffers two fatal flaws. First, Karolyn has conflated the burden of proof necessary to prevail on (or defeat) a claim of undue influence *at trial* with the minimal merit necessary for Gordon to defeat her anti-SLAPP motion at this preliminary stage in the proceedings. As the trial court aptly explained, the presumption of undue influence operates to shift the burden of proof *at trial*. (See *Estate of Gelonese* (1974) 36 Cal.App.3d 854, 863 (*Gelonese*).) It does not alter the minimal merit standard of the second step of the anti-SLAPP analysis.[18]

"The presumption of undue influence, when established, is a rebuttable presumption." (*Gelonese, supra,* 36 Cal.App.3d at p. 862.) The effect of

---

[18]    At oral argument, Karolyn's counsel conceded both that "whether these amendments stand or fail based on undue influence" is a trial issue, and that there is no authority to support Karolyn's position that Gordon cannot establish she lacked probable cause, as a matter of law, simply because she has raised a presumption of undue influence. Counsel argued, "if that is not the law, it should be the law." For the reasons we explain, we disagree.

invoking a presumption " 'affecting the burden of proof is to impose upon the party against whom it operates *the burden of proof* as to the nonexistence of the presumed fact.' " (*Id.* at p. 863, italics added.) Accordingly, when a party " 'has shown by a preponderance of the evidence that the proponent of a will sustained a confidential relationship toward the testator, actively participated in procuring the execution of the will, and unduly profited thereby, a presumption of undue influence, i.e., the presumed fact, arises, and the burden then shifts to the proponent to prove that the will was not induced by his undue influence.' " (*Ibid*.) But "[t]he question of whether the evidence adduced by a party who has the burden of proof carries the required weight *is for the trier of fact and not the court of review*." (*Ibid*., italics added.) Whether Karolyn has presented sufficient evidence to invoke the presumption in the first instance, and, whether Gordon has rebutted it, are ultimately issues for the jury to decide at trial. As Karolyn's appellate counsel himself acknowledged: "[T]he No-Contest Petition may or may not be granted down the road. *The Court is not deciding that today*." (Italics added.)

By contrast, to overcome Karolyn's anti-SLAPP motion to strike the No-Contest provision, Gordon only needed to establish that his claim—Karolyn brought the Invalidity Petition without probable cause—had minimal merit. (See *Soukup, supra,* 39 Cal.4th at p. 269, fn. 3.) In other words, Gordon did not need to prove his case in its entirety to defeat Karolyn's anti-SLAPP motion. He simply needed to establish that his claim that Karolyn brought the Invalidity Petition without probable cause was "legally sufficient and factually substantiated." (*Baral, supra,* 1 Cal.5th at p. 396.) Regardless of any burden shifting that may occur *at trial*, Gordon can still prevail on his No-Contest Petition if he can prove, as he claims, Karolyn *knew* the disputed

32

amendments were the product of her own fractured relationship with her parents, and *not* the result of any undue influence by Gordon. On that, we have already concluded that Gordon's evidence, which we must accept as true, was more than sufficient to establish Karolyn knew this to be the case and thus it met the minimal merit standard necessary to defeat Karolyn's anti-SLAPP motion. (See *Soukup,* at pp. 269, fn. 3, 291.)

Second, Karolyn did not present evidence, or even allegations, sufficient to invoke the presumption of undue influence in the first instance. Rather, as Karolyn herself conceded in her anti-SLAPP motion, "the hallmark element of her undue influence claim"—whether Gordon *actively participated* in the actual procurement of the amendments—remained "unsettled."

In the Invalidity Petition, Karolyn asserted she "is *informed and believes*, and thereon alleges, that after a reasonable opportunity to obtain discovery, the evidence *will show* that Gordon actively participated in the procurement of the Sixth, Ninth, Tenth, and Eleventh Amendments, by procuring his own private counsel to prepare the Tenth and Eleventh Amendments or otherwise dictating the content thereof." (Italics added.) Karolyn also alleged Gordon used intimidation tactics to control her interactions with Jay and Lael, and used "similar actions and tactics" to procure the execution of the disputed amendments. But Karolyn provides no explanation of how exactly Gordon procured, or otherwise *actively participated* in the procurement of, the amendments, nor does she provide any evidence to support the claim. (See *Mann, supra,* 184 Cal.App.3d at pp. 608–609 [" ' "[a] will cannot be overturned on the mere speculation or suspicion that undue influence may have been used to procure it" ' "].)

At most, Karolyn alleges Gordon influenced Jay and Lael's choice of estate planning counsel and she *believed* Gordon "wrote or otherwise

33

provided" the 2008 statement they executed. Neither allegation supports the element of active participation necessary to invoke the presumption of undue influence. "The procurement of a person to witness the will or of an attorney to draw it does not itself constitute active participation in the preparation of the will." (*Estate of Fritschi* (1963) 60 Cal.2d 367, 376.) And while participation in the preparation of the instrument may be sufficient to establish active participation as required to invoke the presumption of undue influence (*ibid.*), Karolyn concedes that an attorney drafted each of the disputed amendments, and that it was Jay's longtime friend and estate attorney, Lewis, who drafted the Sixth and Ninth Amendments to the Trust.

Beyond her own speculative and conclusory allegations, Karolyn relies on a single statement in a letter brief prepared by counsel in the context of the current litigation to assert Gordon participated in and was "essential" to Jay and Lael's estate planning meetings. The letter does nothing to support Karolyn's position. In addressing the attorney-client privilege and work-product issues relevant to Karolyn's request for Jay and Lael's estate planning file, counsel explained, Gordon "has assisted Jay's lawyers in communicating and in relaying documents to and from Jay" and that Gordon's involvement is "essential to Jay's representation, especially the litigations." In context, it is apparent these statements related to Gordon's *recent* conduct, made after Lael's death and during the course of the current litigation. Nothing in the letter even remotely suggests Gordon *actively participated* in the procurement of any of the disputed amendments.

Finally, even if Gordon did not specifically argue that Karolyn failed to invoke the presumption, he rebutted it. Gordon provided sworn statements from Jay and Jay and Lael's estate planning attorney, Crandell, confirming that Jay and Lael made the decision to disinherit Karolyn independent of

Gordon. Crandall averred that she prepared the Tenth and Eleventh Amendments; that she "*did not meet or talk to Gordon*" in 2009 when she first began working with Jay and Lael (italics added); and that Jay and Lael personally explained to her their reasons for adding the $300,000 gift to Karolyn, along with the no-contest clause, in the Eleventh Amendment. Again, Gordon provided ample evidence, including Karolyn's own admissions, to establish that Karolyn knew for years that Jay and Lael intended to disinherit her, not because of Gordon's influence on them, but because of her own contentious relationship with them. Thus, even if Karolyn could invoke the presumption of undue influence, Gordon presented evidence sufficient to overcome both the presumption itself, and any associated inference that the presumption provided Karolyn probable cause to file her Invalidity Petition.

2. *Karolyn's Additional Claims of Mental Incapacity and Fraud*

Next, Karolyn asserts Gordon *also* had to establish she had no probable cause to contest the Eleventh Amendment based on fraud in the inducement and/or Lael's mental incapacity. This argument fails as well. Karolyn argues "[b]ecause a contested testamentary instrument may be invalidated on alternatively stated grounds – including, as here, the settlor's lack of capacity – it follows that, in responding to an anti-SLAPP motion, the proponent must show that the contestant lacked *probable cause* as to <u>all</u> of her claims." Karolyn provides no support for this assertion. The sole case she does rely on, *Dae v. Traver* (2021) 69 Cal.App.5th 447 (*Dae*), does not help her.

As here, the court in *Dae* considered only whether the party filing a no-contest petition provided sufficient evidence to show a likelihood of success under the second step of the anti-SLAPP procedure. (*Dae, supra,* 69 Cal.App.5th at pp. 455–456.) The moving party, Dae, asserted his petition did not directly challenge the trust at issue, but " 'merely challenge[d] the

35

manner in which [the trustee]' " used his powers under the trust. (*Id.* at p. 457.) The court disagreed and concluded the allegations in Dae's petition could amount to a contest. (*Id.* at p. 458.) In reaching that conclusion, the court explained, "[w]e emphasize that we do not now decide that Dae's Petition amounted to a 'contest' for purposes of the No[-]Contest Clause. Whether there has been a contest within the meaning of a particular no[-]contest clause *depends upon the individual circumstances of the case and the language of the particular instrument.*" (*Id.* at p. 461, italics added.)

The no-contest clause at issue here applies to "[e]ach beneficiary . . . who at any time, without probable cause, contests the validity of or seeks to invalidate *any provisions* of . . . this Trust." (Italics added.) It is at least plausible that Gordon could prevail on his No-Contest Petition by establishing that Karolyn's attempts to invalidate the Sixth, Ninth, and Tenth Amendments based on undue influence constituted an impermissible contest to the trust, regardless of whether or not she had probable cause to assert her additional claims regarding the Eleventh Amendment.

In any event, Gordon's assertion that Karolyn was well aware, before filing the Invalidity Petition, that Jay and Lael had disinherited her based on her own hostile relationship with them applies to these additional claims as well. It is apparent the purpose of the Invalidity Petition is to dispute the provisions of the Trust that leave the majority of the trust estate to Gordon. As we have explained, Gordon has presented evidence sufficient to establish that no reasonable person standing in Karolyn's shoes at the time she filed the Invalidity Petition would believe there was a reasonable probability that the trial court would grant the relief she requested. (See § 21311, subd. (b).)

In sum, we conclude Gordon presented more than sufficient evidence to establish the minimal merit necessary to prevail on the second step of the

36

anti-SLAPP analysis. The trial court did not err in denying Karolyn's anti-SLAPP motion.

## II.

### *The Trial Court Did Not Abuse Its Discretion in Awarding Attorney Fees as Sanctions Against Karolyn*

Code of Civil Procedure section 425.16, subdivision (c), provides "[i]f the court finds that a special motion to strike is frivolous or is solely intended to cause unnecessary delay, the court shall award costs and reasonable attorney's fees to a plaintiff prevailing on the motion, pursuant to [Code of Civil Procedure] [s]ection 128.5." Code of Civil Procedure section 128.5 in turn, provides that a trial court may award "reasonable expenses, including attorney's fees, incurred by another party as a result of actions or tactics, made in bad faith, that are frivolous or solely intended to cause unnecessary delay." (Code Civ. Proc., § 128.5, subd. (a).) The statute defines " '[f]rivolous' " as "totally and completely without merit or for the sole purpose of harassing an opposing party." (*Id.*, subd. (b)(2).)

Here, the trial court concluded Karolyn's motion to strike the No-Contest Petition was "was totally and completely without merit." The court found "Karolyn was well aware of [the] evidence [supporting Gordon's claims] because most of the evidence [was] in the form of communications to and from her." Thus, the court found sanctions were mandatory and awarded Gordon attorney fees in the undisputed amount of $48,875. We review the trial court's award of attorney fees for an abuse of discretion (see *Moore v. Shaw* (2004) 116 Cal.App.4th 182, 199), and find no such abuse.

We agree with the trial court that Karolyn's anti-SLAPP petition was completely without merit. No reasonable person knowing what Karolyn knew at the time she filed her anti-SLAPP motion would believe Gordon

brought the No-Contest Petition "to chill the valid exercise of [Karolyn's] constitutional rights." (Code Civ. Proc., § 425.16, subd. (a).) Even before filing her Invalidity Petition, Karolyn knew that it was her own "cold and acrimonious" relationship with Lael, and to a lesser extent Jay, that was the true driving force behind their decision to exclude her as a beneficiary to the Trust.

In the 2009 email from Jay to Karolyn, which Karolyn concedes is authentic, Jay explained he no longer wanted to have a relationship with her because her "outbursts, both in print and verbally," were "unacceptable" and "extremely painful" for both him and Lael. Karolyn's relationship with her parents did not improve after that exchange. In 2018, Karolyn described Lael as a "fucking, stingy, hoarding bitch," and said that Jay had "sacrificed his daughter for his hole of a wife." She said she would not "subject [herself] to the devaluation of having any contact with [Jay] knowing exactly how little he thinks of [her]." In a letter Karolyn sent to the host of a public YouTube show ("the Narcissistic Resistance"), which the host then read aloud on the show, Karolyn stated: My father "liked torturing me every bit as much as my mother did. . . . [¶] I wish both of them would drop dead today. They are horrible awful people[.]" Her letter continued: "That's one fucked up family and I don't need to be any part of it. Have a good time leaving your drug-addicted son all your millions asshole." These statements are just a few of many that make it abundantly clear that Karolyn knew and understood her parents' true reasons for disinheriting her long before she filed the Invalidity Petition.

But Karolyn had even more reason to know that she lacked probable cause by the time she filed the anti-SLAPP motion. By then, both Jay and Gordon had responded to her Invalidity Petition. In his objection and

response, Jay explained he and Lael had intended to leave a greater portion of the estate to Gordon as early as 1995, in part because Gordon had children and Karolyn did not. He confirmed that "Karolyn's hostile and volatile relationship with her parents [was] a significant source of pain and frustration, further explaining the desire to leave a larger share of the Estate to their son and his children, with whom they have had a very close and loving relationship." In the No-Contest Petition, Gordon expressly asserted Karolyn's own written communications with Jay demonstrated she was well aware her parent's estate planning choices "were intentional, deliberate, and a result of the strained relationship that [she] maintained with her family for her entire life." Even Karolyn's own counsel acknowledged, during argument on the anti-SLAPP motion: "It may be that she deserves to be disinherited at some point[.]"

It is also apparent on the record before us that Karolyn brought the anti-SLAPP motion purely as a litigation tactic. As set forth in Caverly's declaration, Karolyn filed the motion "[l]ess than one week after assuring a document production would be forthcoming." And, by the time Gordon filed his opposition, Karolyn had not produced a single document in response to Gordon's requests, despite the previous assurances. Karolyn asserted discovery was stayed based on the anti-SLAPP motion, and pursuant to Code of Civil Procedure section 425.16, subdivision (g), applied to *all* pending petitions, and that stay precluded discovery on *all* pending petitions, including both her Invalidity Petition and her petition to remove Jay as

39

trustee.[19]  Karolyn further asserted the parties could not move forward with a discovery hearing, to which they had previously stipulated.

Moreover, Karolyn's counsel revealed at the anti-SLAPP hearing that Karolyn "elected to do the motion to strike because it appears to be very effective at fleshing out the probable cause, or lack thereof, which is what Gordon must show in relation to this motion.  The motion shifts the burden to him to show a lack of probable cause in this case."  Counsel continued:  "I understand why the Invalidity Petition or the No-Contest Petition was brought strategically.  And this motion was an effort, and an appropriate effort, *to try to figure out what [Gordon's] evidence was*."  (Italics added.)  The court inquired:  "How about filing an objection and then entertaining discovery?  Why do we need to bring an anti-SLAPP motion?"  Counsel responded:  "Well, it pins down the discovery as it exists on that date, and *that's the purpose of it*."  (Italics added.)  He further stated:  "It's a decent, *strategic* move, frankly, to try to pin down the other side."  (Italics added.)

On this record, we have little difficulty agreeing with the trial court that Karolyn's anti-SLAPP motion was completely without merit, having admittedly been filed for pure tactical purposes.  Karolyn, an attorney herself, was surely aware the purpose of the anti-SLAPP statute "is to prevent the chilling of 'the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances' by the 'abuse of the judicial process.' "  (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 313, quoting Code Civ. Proc., § 425.16, subd. (a).)  It is not a mechanism for obtaining early, one-sided discovery.  The trial court did not abuse its discretion in

_____

[19]  The trial court rejected this position in its order denying the motion to stay, and concluded, instead, "[a]ny stay of discovery resulting from the filing of an anti-SLAPP motion would apply only to the No-Contest Petition."

awarding sanctions in the form of attorney fees against Karolyn.  (See Code Civ. Proc., § 128.5, subds. (a), (b)(2).)

## DISPOSITION

The order denying Karolyn's motion to strike Gordon's No-Contest Petition and awarding Gordon sanctions is affirmed.  Gordon is awarded his costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


DO, J.

WE CONCUR:


O'ROURKE, Acting P. J.


IRION, J.